WASTE MANAGEMENT OF WISCONSIN, INC., a domestic corporation, Petitioner-Appellant,†

v.

State of Wisconsin DEPARTMENT OF NATURAL RESOURCES, Respondent.

Supreme Court

*Nos. 83-2356, 83-2446, 84-600. Argued September 5, 1985.— Decided October 29, 1985.*

(On bypass of the Court of Appeals.)
(Also reported in 376 N.W.2d 345.)

† Motion for reconsideration pending. This motion was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

78

For the petitioner-appellant there were briefs by *Robert H. Friebert, David P. Lowe, William S. Roush, Jr., Madeleine E. Kelly* and *Friebert, Finerty & St. John,* Milwaukee, and oral argument by *Robert H. Friebert.*

For the respondent the cause was argued by *Carl A. Sinderbrand,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM A. BABLITCH, J. Waste Management Inc. (Waste Management) appeals decisions of three circuit courts, all of which held that Waste Management has no due process or statutory right to a hearing before the Department of Natural Resources (DNR) at which to challenge certain actions by the DNR involving two solid waste disposal sites which Waste Management owns. In the first case, the DNR denied Waste Management's request for a modification of a "feasibility determination" for a site known as the "Metro site." In the other cases, the DNR imposed certain requirements on Waste Management's "plan of operation" for a site known as the "Omega Hills site." In all three cases, the DNR denied Waste Management's subsequent requests for hearings on its actions.

Waste Management also appeals the courts' holdings that the DNR's actions were not judicially reviewable

and that the DNR's actions were not arbitrary or capricious.

Because we conclude that Waste Management does not have an interest in its feasibility determination or its conditionally approved plan of operation which is protected by the fourteenth amendment, and because we conclude that neither ch. 144, Stats., nor sec. 227.064 gives Waste Management a right to a hearing, we hold that Waste Management does not have a constitutional or statutory right to a hearing before the DNR to challenge these actions. However, we also hold that Waste Management has a right to judicial review of the DNR's actions on requirements to its plan of operation on which Waste Management and the DNR reach an impasse. Finally, we hold that the DNR is required to issue such actions in conformance with the requirements of sec. 227.10.

Inasmuch as these cases involve the statutory screening process which precedes licensing of solid and hazardous waste disposal sites, we begin with an overview of that statutory process. The screening process established by sec. 144.44, Stats., consists of two distinct phases. In the first phase, the DNR reviews plans for construction and operation of waste disposal sites submitted by persons seeking to license new facilities. In some circumstances the DNR must require an applicant for a license to prepare an environmental impact statement or to submit its plan to a public hearing. Section 144.44(1)–(4). One key requirement in the first phase is that the license applicant submit a feasibility report to the DNR and obtain a decision from the DNR that its site is feasible for the proposed use; that decision is known as the "site feasibility determination." Section 144.44(2). When the DNR issues a favorable feasibility determination, the applicant is then qualified to submit a "plan of operation," which the DNR must also approve, disapprove, or approve with conditions within

90 days of submission. Section 144.44(3)(c), cited in full below. Although sec. 144.44(3)(c) does not use the words "conditional approval," that section states in part that "[a]n approval may be conditioned upon any requirements necessary to comply with the standards." The standards referred to are those "established under s. 144.435 or, in the case of hazardous waste facilities, with the rules and standards established under s. 144.62." Section 144.44(3)(c).

In the second phase, which begins after approval of a plan of operation, the DNR retains authority to make modifications to the plan under certain specified circumstances. Section 144.44(3)(d), Stats. However, unless the special circumstances listed in sec. 144.44(3)(d) exists, an applicant with an approved plan of operation may construct a facility according to the plan up to a specified design capacity. Section 144.44(3)(d). Nonetheless, the DNR's approval of a plan of operation does not automatically entitle the applicant to be licensed. Section 144.44(3) and (4). Unless the applicant constructs in accordance with the plan, the DNR may not initially license the facility. Section 144.44(4)(d). In addition, the DNR may deny, suspend or revoke an operating license based on grievous or continuous failure of an operator to comply with the plan of operation. Section 144.44(4)(a).

Rights of applicants for an operator's license are also affected by sections of ch. 227, Stats., which provide for judicial review of some administrative agency actions and which require an agency to hold hearings on others. Sections 227.15 and 227.064.

In the Metro site case, no. 84–600, Waste Management began the screening process in 1976. On June 4, 1980, the DNR issued a favorable feasibility determination for its proposed site. On July 18, 1980, Waste Management orally requested that the DNR modify the feasibility determination to permit it to remove an additional

thirty feet of clay soils from the site to be used as cover material. Removal of the soils would have lowered the base grade of the area, approximately 40 acres in size, by an additional thirty feet. According to Waste Management, its request was based on new information which indicated that the base grade could be lowered without violating criteria on which the DNR had based its feasibility determination.

The DNR denied the request. It took the position that the request was inconsistent with Waste Management's original proposal, had not been presented to the public in an environmental impact statement or at a hearing and would be an expansion of the site under ch. 377, Stats., and NR 180, Wisconsin Administrative Code. It therefore indicated that a modification of this magnitude would require an entirely new feasibility determination.

By letter on September 12, 1980, Waste Management requested a contested case hearing on the denial of its request. On September 23, 1980, the DNR denied the request.

Waste Management petitioned the circuit court of Milwaukee county for judicial review of the DNR's denial of its requests. It asked the court to nullify the DNR's requirement for a full review prior to a modification of the feasibility determination and to order the DNR to make the requested change or, alternatively, to order the DNR to grant it a hearing on its request. The circuit court affirmed the DNR's actions.

Cases no. 83–2356 and 83–2446 involve the Omega Hills site. In these cases the DNR had already issued a favorable feasibility determination. The center of the controversy is the plan of operation which Waste Management submitted to the DNR and to which the DNR formally responded on June 15, 1978. In that response, the DNR "tentatively" approved the plan of operation, with the condition that Waste Management meet a number of specific requirements.

These requirements became the subject of consider-able interchange between the DNR and Waste Manage-ment in 1980, 1981, and 1983, which led to some changes in the requirements. Nevertheless, the DNR and Waste Management never reached full agreement on all re-quirements in the plan and the 1978 requirements, with some modifications, remained in force in 1980. On Sep-tember 10, 1980, April 6 and 30, 1981, and March 23, 1983, the DNR issued letters to Waste Management changing some requirements to the plan and affirming others. On all four dates Waste Management disagreed with some or all of the DNR's changes. At each such impasse, Waste Management filed petitions in the cir-cuit court of Milwaukee county for judicial review of the DNR's authority to impose the requirements, and of the DNR's subsequent denials of hearings on its ac-tions. The circuit courts affirmed the DNR's actions.

On Waste Management's appeal, all three cases were consolidated. The DNR petitioned to bypass review by the court of appeals and we granted the petition.

The issues for review are:

1) Does Waste Management have a constitutional right to a hearing before the DNR on either: a) the DNR's refusal to grant Waste Management's requested modification to its feasibility determination for the Met-ro site; or, b) the DNR's requirements concerning the plan of operation for the Omega Hills site with which Waste Management disagrees?

2) Do these actions by the DNR entitle Waste Man-agement to a hearing pursuant to sec. 144.44(3), Stats.?

3) Do these actions by the DNR entitle Waste Man-agement to a contested case hearing pursuant to sec. 227.064, Stats.?

4) Are these DNR actions judicially reviewable pur-suant to sec. 227.15, Stats., and, if so, is the DNR re-quired to state such actions in conformance with sec. 227.10?

*Issue 1: Whether Waste Management has a constitutional right to a hearing before the DNR on the DNR's actions.*

Waste Management asserts that sec. 144.44(3)(c) and (d), Stats., confers on it interests in its feasibility determination for the Metro site and in its plan of operation for the Omega Hills site which are protected by the fourteenth amendment to the United States Constitution. It also argues that its business investment in the sites constitutes an interest protected by the fourteenth amendment.

The DNR argues that Waste Management has no interest in its feasibility determination, plan of operation or business investment which merits due process protection.

The United States Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564 (1972), defined interests under the fourteenth amendment as including some benefits conferred on persons by state law. We note, however, that *Roth* does not suggest that every interest conferred by state law is a protected interest. Accordingly, we first ask whether the law of this state, specifically ch. 144, Stats., confers an interest which is protected by the fourteenth amendment on Waste Management and whether the DNR's action constitutes a deprivation of that interest. If we determine that the DNR's actions deprive Waste Management of such an interest, then we will determine what procedural protections are due.

In *Roth,* a teacher with a contract to teach at a state university for one year argued that failure of the university to advise him of reasons for not rehiring him at the end of his term deprived him of an interest protected by the fourteenth amendment; specifically, he argued that the university deprived him of a "property" interest. The Court disagreed. It stated that "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Id.* at

576. The Court described certain attributes of property interests and the purpose of due process protection: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577.

Accordingly, the Court examined the terms of Roth's appointment, relevant state statutes, and rules and policies of the university to determine whether any of these secured in Roth an interest in reemployment or created a legitimate claim to it. *Id.* at 578. Because the Court found that the terms of the appointment did not assure Roth that the university would give him reasons for nonrenewal or a hearing on its decision not to rehire him, it held that he lacked an interest sufficient to require a hearing on his nonrenewal. *Id.* at 578. Accordingly, *Roth* makes clear that the terms and conditions which define a person's benefit under state law also determine whether the benefit is a protected interest under the fourteenth amendment.

Since *Roth*, the United States Court of Appeals has applied the *Roth* definition of a protected interest in one case with facts analogous to the facts in these cases. In *Molgaard v. Town of Caledonia*, 696 F. 2d 58 (7th Cir. 1982), the court affirmed a district court's holding that property owners who had been granted a conditional approval of a plan for a mobile home park by a town board had no constitutionally protected interest in completion of the proposed park project in accordance with the plan. *Molgaard* at 60. The district court in *Molgaard* based its holding on its conclusion that the underlying plan approval was not a final approval for the owners' project. The court described the approval as "highly contingent." It stressed that the approval contained seven conditions and that the owners had not been awarded a license to operate the proposed mobile

home park. *Molgaard v. Town of Caledonia,* 527 F. Supp. 1073, 1080 (E.D. Wis. 1981). It wrote:

". . . plaintiffs argue that once the town board approved the plans, they had a property interest . . . to complete the project in accordance with those plans. This argument ignores the facts of this case. The *plaintiffs never received final, unconditional approval of their project;* the town in effect said that the plans submitted were acceptable as far as they went, but that other matters had to be addressed prior to approval. In addition, several of the conditions were beyond the plaintiffs' control. I find that the plaintiffs only had a unilateral expectation that the plans might be approved; they had no cognizable property interest." (Emphasis added.)

We consider *Molgaard* as guidance for our analysis of whether sec. 144.44 (3) (c) and (d), Stats., confers on Waste Management a protected interest in its feasibility determination for the Metro site or its conditionally approved plan of operation for the Omega Hills site, because *Molgaard* defines the interests of persons who have not yet completed all of the requirements to secure a benefit from a state and who may be unable to do so in the future. In that respect, *Molgaard* is distinguished from court of appeals' cases on which Waste Management relies, which define the interests of persons who have finally secured a benefit from a state. *See Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir. 1983); *Baer v. City of Wauwatosa,* 716 F.2d 1117 (7th Cir. 1983); *T.A. Moynahan Prop., Inc. v. Lancaster Village Coop., Inc.,* 496 F.2d 1114 (7th Cir. 1974).

With respect to the Metro site case, involving Waste Management's requested modification of its favorable feasibility determination, sec. 144.44 (2) (a), Stats. 1979 provides:

"Prior to constructing or establishing a site for the land disposal of solid waste or a site for the treatment,

storage or disposal of hazardous waste, the applicant shall submit to the department a feasibility report describing the physical conditions of the proposed site. The purpose of the report and review of the report under this subsection is to determine whether the site has potential for use in solid waste disposal or hazardous waste treatment, storage or disposal and to establish any conditions which the applicant must include in the plan of operation submitted under sub. (3). *Favorable feasibility determination under this subsection does not guarantee plan approval under sub. (3) or licensure under sub. (4).*" (Emphasis added.)

The emphasized language above indicates that all Waste Management has, as the holder of a favorable feasibility determination, is an opportunity to move ahead in the screening process. Although Waste Management's briefs frequently refer to its feasibility determination as a "plan approval," sec. 144.44(2)(a), Stats., makes it very clear that a "favorable feasibility determination" is not the same as a "plan approval." As the holder of a favorable feasibility determination, Waste Management has neither an approved plan of operation nor a license to operate, nor has it in any manner an assurance that it will receive either.

Clearly the interest which the state confers on the holder of a favorable feasibility determination under sec. 144.44(2)(a) and (3)(c), Stats., fails to meet the threshold for a protected interest under federal law. The favorable feasibility determination does not secure an interest in any state benefit. It is conditional on its face. Failure of the holder to comply with conditions in the determination may extinguish the interest as may the discovery of new physical conditions at the site. Any expectation that the holder of a determination has that the DNR will later approve a plan of operation or eventually grant a license based on the feasibility determination is "unilateral." *Roth* and *Molgaard.*

■

We conclude therefore that Waste Management has not established that its interest in its favorable feasibility determination is a protected interest under the fourteenth amendment. We hold accordingly that it has no constitutional right to a hearing before the DNR on the DNR's refusal to grant a modification of the feasibility determination for the Metro site.

With respect to the Omega Hills site cases, we note that whatever due process right Waste Management has must arise from its submission of the plan of operation and the DNR's approval with conditions.

Waste Management submitted its plan of operation to the DNR and the DNR formally responded on June 15, 1978. In a letter, the DNR advised Waste Management that:

". . . the staff's opinion is that your proposal should provide for a satisfactory solid waste disposal operation *provided* the recommendations in the attached Division Report are followed. The site and operating plan are, therefore, *tentatively* approved *subject* to compliance with Chapter NR 151, Wisconsin Administrative code, and *to fulfillment of the recommendations* listed in the attached Division Report." (Emphasis added.)

In its attached report the DNR set forth 44 specific requirements, ending with an all-inclusive requirement, requirement number 44, which stated:

"All portions of this approval are subject to change in conjunction with the detailed review of the monitoring results from both leachate and gas and continuous review of the site operations and working of the plans in the field, other environmental concerns, Chapter NR 151, Wisconsin Administrative Code, other applicable provisions of Chapter 377, Laws of 1977, State of Wisconsin, Laws of 1976 PL–94–500; the Resource Recovery and Conservation Act, if the Department determines it necessary."

Although this letter and the attached report referred to these requirements as "recommendations," both the letter and the attachment make it clear that these recommendations were mandatory requirements and that final approval of the "plan of operation" was subject to fulfillment of these requirements. Although the briefs and arguments submitted to this court referred to the plan as an "approved plan of operation," the record indicates that the DNR never approved the submitted plan, but rather made it clear from the beginning that any approval was tentative and was subject to Waste Management's complying with the specified requirements. At best, Waste Management had a conditional approval. For purposes of the statutory screening process, Waste Management did not have an approved plan of operation.

The record shows that the DNR's letter of June 15, 1978, informed Waste Management that "[t]he site and operating plan are, therefore, tentatively approved subject to compliance with Chapter NR 151, Wisconsin Administrative code, and to fulfillment of the recommendations listed in the attached Division Report." It went on to state:

"These sites will be constructed in many phases. When you have completed your site preparations for each phase and you have fulfilled the conditions of this approval listed under *Site Preparation,* please contact the . . . office and arrange for a field inspection of this site. District personnel will inspect the site to determine the extent and completeness of the site preparation. If the site has been prepared in accordance with the engineering plans submitted and this approval, the District will recommend that filling be authorized in those areas. Your license will be issued shortly and this approval will be made part of the license. No waste is to be deposited above the final grades as specified in the Lauer 2 continued use plan dated May 10, 1977 before the license has been issued."

We interpret this letter as notice to Waste Management
that the DNR's approval was conditional upon Waste
Management's meeting the requirements set forth in
the approval letter. Section 144.44(3)(c), Stats., ex-
pressly gives the DNR the right to conditionally ap-
prove a plan of operation, so long as the conditions are
necessary to comply with the standards of secs. 144.435
and 144.62: "An approval may be conditioned upon any
requirements necessary to comply with the standards."
In this section "conditions" refer back to the standards
of sec. 144.435 and 144.62.

The circuit courts found that Waste Management's
interest in its plan of operation was a "conditional"
interest under the fourteenth amendment. We agree.
The record indicates a lengthy interchange ensued be-
tween Waste Management and the DNR in the years
following the DNR's granting of the conditional ap-
proval for the Omega Hills site on June 15, 1978, with
respect to some of the requirements. On September 10,
1980, after numerous exchanges, which led to some
changes in the DNR's original requirements, the DNR
submitted an extensive letter to Waste Management out-
lining the requirements which Waste Management still
had not met. It is these requirements and subsequent
changes in these requirements, on which the DNR and
Waste Management did not reach agreement, which
form the basis for Waste Management's appeal with
respect to the Omega Hills site.

The record does not show that these requirements
were ever met. We must assume they were not. The
record does not show that the DNR ever went beyond
its conditional approval to final approval, and we must
assume it did not. The record does not show that the
DNR ever issued a license to Waste Management for the
site development, and we must assume that it did not.
We therefore determine the interest of Waste Manage-

ment in the limited context of its having obtained an approval with conditions, but nothing more.

We find that the DNR's approval of Waste Management's plan of operation, which was contingent on Waste Management's compliance with certain requirements, is analogous to the "conditional" approval which the town board granted to property owners in *Molgaard*. Like the town board's approval of the owners' plans for a mobile home park, the DNR's approval of Waste Management's plan of operation was tentative; it contained conditions which must be satisfied prior to a final approval. Final approval was expressly contingent on future actions of Waste Management. Further, like the owners in *Molgaard*, Waste Management had not been awarded a license which it might reasonably consider a final approval of its plan.

Accordingly, we hold that Waste Management has no protected interest in the conditional approval which the DNR gave to its plan of operation and therefore no constitutional right to a hearing before the DNR on the DNR's changes in requirements.

Waste Management also argues that its business investment in its sites is an interest which requires due process protection prior to the DNR's actions relating to both sites, citing *Chicago, M. & St. P. Ry. Co. v. Minnesota,* 134 U.S. 418 (1890) and *Southern Ry. Co. v. Virginia,* 290 U.S. 190 (1933). We do not agree.

In the cases cited by Waste Management, the issue before the Court was whether a state could delegate to an administrative agency its authority to set standards for the regulation of private businesses affected with the public interest. Thus, in *Chicago Railway* the Court reviewed a Minnesota law which authorized a regulatory commission to set rates for some railroad shipments and which precluded judicial review of the rates. It held that the statute violated the fourteenth amend-

ment rights of the railroad companies because it deprived them of a legal use of their property without due process. *Chicago Railway* at 458. Similarly, in *Southern Ry.* the Court reviewed a Virginia statute which authorized an administrative agent to require a railroad to substitute some safety equipment for other equipment when public safety and convenience required and which provided no notice or hearing on the existence of the necessity. As in *Chicago Railway*, the Court held that the state's delegation to an agency of its power to set standards without provision for judicial review violated the fourteenth amendment by taking property of the rail companies without due process. *Southern Ry.* at 194.

In this context the Court did not define "property" as an interest for constitutional purposes. It assumed that property owned by the railroad companies was a protected interest. Therefore, it focused on the question of whether an imposition of new regulatory standards constituted a "taking" of this interest by a public agency. *Chicago Railway* at 458; *Southern Ry.* at 194.

For our purposes, the only question raised by these cases is whether the DNR's actions were "takings" of Waste Management's interest in its investment in its sites. We find that none of the DNR's actions constituted a "taking" or deprivation of that interest. We see a crucial difference between the facts of *Chicago Railway* and *Southern Ry.* and the facts of these cases. Whereas the railroads sought protection against an administrative agency's imposition of new regulatory standards, Waste Management in both the Metro and Omega Hills cases seeks protection from requirements of the licensing process in sec. 144.44, Stats., which are not new but only implement standards in effect when Waste Management reached certain points in the process. Waste Management's analogy between the deprivation of the interests of the rail companies in these early cases

and the impact of these DNR actions on its interests is unconvincing.

Because we find that Waste Management has not established that the DNR's actions amount to a deprivation of its interest in its business investment, we decline to hold that this interest must be protected by a hearing before the DNR.

Because we find that none of these DNR actions deprive Waste Management of a protected interest, we do not reach the arguments of the parties on constitutionally appropriate protections for Waste Management's interests nor do we reach their arguments about the possible effect of enforcement actions on due process analysis.

*Issue 2: Whether Waste Management has a right to a hearing before the DNR on the DNR's actions under sec. 144.44(3), Stats.*

In order to determine Waste Management's rights under sec. 144.44, Stats., we must construe several sections of ch. 144. The construction of statutes in relation to a given set of facts is a question of law. *State v. Clausen,* 105 Wis. 2d 231, 243, 313 N.W.2d 819 (1982). This court must decide questions of law independently without deference to the decision of the trial court. *Ball v. District No. 4, Area Board,* 117 Wis., 529, 537, 345 N.W.2d 389 (1984).

In the Metro site case, Waste Management argues that its favorable feasibility determination for the site is the equivalent of a plan of operation "approval." According to Waste Management, its determination therefore entitles it to a hearing under sec. 144.44(3)(c) and (d), Stats., which it construes as requiring the DNR to hold hearings on modifications of "approvals." It cites the following sentence from the section to support its position: "Any approval may be modified by the department upon the application of the licensee if newly

discovered information indicates that the modification would not inhibit compliance with the standards adopted under s. 144.435 or, if applicable, s. 144.62."

The DNR contends that the section is inapplicable to a site feasibility determination. We agree. Section 144.-44(3)(c), Stats., provides:

*"Approval; disapproval.* The department may not approve or disapprove a plan of operation until a favorable determination of feasibility has been issued for the facility. Upon the submission of a complete plan of operation, the department shall either approve or disapprove the plan in writing within 90 days or within 60 days after a favorable determination of feasibility is issued for the facility, whichever is later. The determination of the department shall be based upon compliance with the standards established under s. 144.435 or, in the case of hazardous waste facilities, with the rules and standards established under s. 144.62. An approval may be conditioned upon any requirements necessary to comply with the standards. Any approval may be modified by the department upon application of the licensee if newly discovered information indicates that the modification would not inhibit compliance with the standards adopted under s. 144.435 or, if applicable, s. 144.62. No plan of operation for a solid or hazardous waste facility may be approved unless the applicant submits technical and financial information required under ss. 144.441 and 144.443."

The words "approval" and "disapproval" in this section, contrary to the assertion of Waste Management, refer only to approvals, approvals with conditions, or disapprovals of plans of operation. This section does not use these terms to describe a feasibility evaluation report. In all respects, this section unambiguously addresses only approval or disapproval of plans of operation, not feasibility reports. Therefore, sec. 144.44(3) (c), Stats., is inapplicable.

Accordingly, we hold that Waste Management has no right under sec. 144.44(3)(c), Stats., to a hearing before the DNR on the DNR's refusal to modify its feasibility determination.

We need not reach Waste Management's arguments in regard to sec. 144.44(3)(d), Stats., because subsection (3)(d) relates back to the preceding subsection. It begins: "Approval under par. (c) entitles the applicant. . . ." Because subsection (c) applies only to plans of operation, and not feasibility reports, subsection (d) is inapplicable to a feasibility report as well.

The Omega Hills site cases involve the controversy between Waste Management and the DNR over requirements which the DNR imposed when it conditionally approved the plan of operation for the site on June 15, 1978. Following requests by Waste Management for changes in certain requirements on July 7, 1978, and September 7, 1978, and extensive discussion of requirements by Waste Management and the DNR, the DNR issued changes in some requirements on September 10, 1980. Similarly, it issued changes in requirements on April 6 and 30, 1981, and March 23, 1983. In general, the changes related to requirements for ground water monitoring, collection and treatment of toxic liquids and other specific aspects of the preparation, construction and operation of the site. Some changes set different deadlines for Waste Management to meet specific requirements and to make reports to the DNR. Notwithstanding the modifications, the approval remained conditioned upon the fulfillment of the requirements.

According to Waste Management, sec. 144.44(3)(d), Stats., requires the DNR to hold a hearing to establish specific reasons for requirements in Waste Management's plan of operation.

Section 144.44(3)(d), Stats. 1979, provides:

"(d) Approval under par. (c) shall entitle the applicant to construct and operate the site in accordance

with the approved plan for not less than the design capacity specified in the determination of site feasibility, unless the department establishes *by clear preponderance of the credible evidence* that:

"1. The site is not constructed in accordance with the approved plan;

"2. The site poses a substantial hazard to public health or welfare; or

"3. In-field conditions, not disclosed in the feasibility report or plan of operation, necessitate modifications of the plan to comply with standards in effect at the time of plan approval under s. 144.435 or, if applicable, s. 144.62." (Emphasis added.)

As we noted above, sec. 144.44(3)(c), Stats., authorizes the DNR to disapprove plans of operation, to approve plans, or to approve plans with conditions to the extent that conditions are needed to ensure that the proposed site meets standards established under sec. 144.435 or, when applicable, sec. 144.62. Section 144.44 (3)(d) unambiguously sets out the rights of applicants whose plans have been approved. It does not address a conditional approval. For this reason we interpret sec. 144.44(3)(d) as delineating the rights of applicants with approved plans only, not the rights of applicants with conditional approvals. We therefore hold that Waste Management has no right under sec. 144.44(3) to a hearing before the DNR on the requirements which the DNR imposed on its plan of operation which were effective on September 10, 1980, April 6 or April 30, 1981.

On March 23, 1983, when the DNR issued the last set of requirements to Waste Management's plan of operation in this appeal, an amended version of sec. 144.44(3), Stats., applied. Section 144.44(3)(g) 1981 provides: "There is no statutory right to a hearing before the department concerning the plan of operation but the department may grant a hearing on the plan of operation under s. 144.431(2)(a)."

■
Section 144.44 (3) (g), Stats. 1981, resolves the question whether the DNR was required to hold a hearing concerning the plan of operation with respect to the March 23, 1983, action. The requirements in question concerning Waste Management's plan of operation were imposed after this section became effective. Therefore we hold that Waste Management has no right to a prior hearing on the DNR's issuance of these requirements.

*Issue 3: Whether Waste Management has a right to a hearing on the DNR's actions under sec. 227.064, Stats.*
Waste Management contends that sec. 227.064, Stats., entitles it to a contested case hearing before the DNR on both the DNR's refusal to modify the site feasibility determination for the Metro site and on the DNR's requirements in the conditionally approved plan of operation for its Omega Hills site with which Waste Management disagrees. It argues that it satisfies the criteria for standing under this section and is not excepted from coverage by subsections (3) and (5). The DNR argues that Waste Management does not meet the standing requirements of the section and that subsections (3) and (5) exempt these actions.

Because we find that the DNR's actions on these dates were excepted from coverage of sec. 227.064(3), Stats., we need not determine whether Waste Management met the standing requirements of the section or separately determine the rights of Waste Management under subsection (5).

As we decide today in *Milwaukee Metropolitan Sewerage District v. Wisconsin Department of Natural Resources,* 126 Wis. 2d 63, 72, sec. 227.064, Stats., confers a right to a contested case hearing before an administrative agency on persons who meet its criteria for standing unless exceptions in subsections (3–5) apply.

Section 227.064(3), Stats., provides in part: "This section does not apply to . . . actions where hearings at the discretion of the agency are expressly authorized by law." We construe section (3) to make the section inapplicable to an action of an administrative agency if the agency has legal authority to hold hearings on the action at its discretion.

In regard to the Metro site, sec. 144.431(2)(a), Stats., governs any right of Waste Management to a hearing on its feasibility determination. It provides that the DNR "may: (a) Hold hearings relating to any aspect of the administration of ss. 144.43 to 144.47. . . ." In this section use of the word "may" clearly authorizes the DNR to hold a hearing but does not require the DNR to do so. For this reason we find that the exception to coverage of sec. 227.064 in subsection (3) is satisfied. We hold accordingly that Waste Management has no right under sec. 227.064 to a hearing before the DNR prior to the DNR's refusal of its request for a modification of a feasibility determination.

Similarly, our holding above in regard to the Omega Hills site, that sec. 144.44(3)(d), Stats., does not require the DNR to hold a hearing prior to issuing requirements to a conditionally approved plan of operation, determines the resolution of Waste Management's rights under sec. 227.064 in regard to that site. As in the Metro site case, the DNR is authorized to hold hearings at its discretion pursuant to sec. 144.431(2)(a). Its discretionary authority satisfies subsection (3) of sec. 227.064. Therefore we hold that Waste Management has no right to a contested case hearing before the DNR on the DNR's requirements to the plan of operation issued on September 10, 1980, April 6 and April 30, 1981.

*Issue 4: Whether these DNR actions are judicially re-viewable under sec. 227.15, Stats., and whether the DNR must state such actions in conformance with sec. 227.10.*

In the Metro site case, the circuit court found that it lacked jurisdiction over the DNR's refusal to modify Waste Management's feasibility determination because Waste Management failed to petition for review of the action in a timely manner. In the Omega Hills site cases, the circuit courts held that the DNR's changes in re-quirements in the conditionally approved plan of opera-tion were not judicially reviewable under sec. 227.15, Stats., because they were not "final decisions." Accord-ing to the courts, the actions could not be considered final decisions unless they contained findings of fact and conclusions of law as required of final decisions under sec. 227.10. Waste Management argues that the circuit courts erred in so holding. The DNR does not dispute the reviewability of its actions in the Omega Hills cases, but does argue that the actions need not conform to sec. 227.10.

With respect to the Metro site, we must first determine whether Waste Management's petition for judicial re-view was timely filed. Section 227.16(1)(a), Stats., pro-vides that petitions for judicial review of administrative agency decisions must be filed within 30 days after the service of the decision of the agency on all parties. The record shows that the DNR denied Waste Management's request for a modification of its feasibility determina-tion by letter on August 13, 1980, and that Waste Man-agement filed for a hearing by the circuit court on Octo-ber 23, 1980. Because the record supports the court's holding that the petition for review was untimely, we affirm the holding.

In regard to the Omega Hills cases, we note that the right of judicial review is entirely statutory, and that

orders of administrative agencies are not reviewable unless made so by statutes. *Wis. Environmental Decade v. Public Service Comm.*, 93 Wis. 2d 650, 657, 287 N.W.2d 737 (1980). Section 227.15, Stats., provides for judicial review of administrative agency "decisions" which adversely affect the "substantial interests" of a person, with certain exceptions which are not applicable to these cases. It states: "Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, are subject to review as provided in this chapter. . . ."

Standing to seek review of an administrative action under secs. 227.15 and 227.16, Stats., depends on a showing by the petitioner of a direct injury on its legally protected interests. *Public Intervenor v. DNR,* 115 Wis. 2d 28, 35, 339 N.W.2d 324 (1983). In the Omega Hills cases the DNR does not challenge Waste Management's standing or dispute that its investment in its site at this stage in the screening process for a license is a "substantial interest" for the purpose of sec. 227.15. Therefore, in order to decide whether Waste Management has a right to judicial review of the DNR's changes in requirements in the plan of operation for the Omega Hills site in 1980–83, we must determine only whether the DNR's actions constitute "decisions" under sec. 227.15.

In *Pasch v. Department of Revenue,* 58 Wis. 2d 346, 353, 206 N.W.2d 157 (1973), we restated the established test for whether an agency determination constitutes a decision entitled to judicial review. We interpreted sec. 227.15, Stats., as providing that only those administrative actions which directly affect the legal rights, duties or privileges of a person are reviewable. We observed that it was not the legislature's intent to authorize the review of "mere preliminary action" on the part of an agency. *Id.* at 355–56. Instead, the legislative intent was

to limit judicial review of administrative agency actions to "final orders" of the agency. *Id.* at 353. We wrote:

". . . neither the form of the order nor the label of 'final' or 'interlocutory' necessarily determines its character as to reviewability. . . .

" '. . . The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow . . . .' " *Id.* at 356.

We distinguished the facts underlying our earlier holding in *Neu's Supply Line v. Department of Taxation,* 39 Wis. 2d 584, 159 N.W.2d 742 (1968), which determined that an order of the Department of Taxation denying relief from a subpoena duces tecum was reviewable as an order directly affecting the legal rights, duties and privileges of the party challenging the order, from the facts of the case on appeal. In *Pasch* we found that an order of the Department of Revenue finding that it had jurisdiction to proceed to a hearing on the merits of its assessment of taxes against a taxpayer did not directly affect the taxpayer's legal rights, duties or privileges, in that the taxpayer, unlike the subpoenaed party in *Neu's Supply Line,* retained the right to challenge jurisdiction after a final determination by the Department of Revenue on the merits of the controversy. *Pasch* at 356-57. Accordingly, we held that the Department of Revenue's denial of a taxpayer's request for an abatement of taxes pending further departmental review of its assessment was not a judicially reviewable action. *Id.* at 356-57.

In *Wis. Environmental Decade* we again considered the requirement that actions of an agency be final in order to be reviewable under sec. 227.15, Stats. In that case we reviewed an order of the Public Service Commission which denied the request of a public interest

organization for investigation of some complaints about the winter rates of utilities. We observed that sec. 227.15 envisions review of decisions "which must be supported by a *record* and be based upon *findings of fact* and *conclusions of law* as required by sec. 227.10." *Id.* at 659a. Finding that the PSC's order was not a final decision and was not in the format required for a final decision under sec. 227.10, we held that the PSC's order denying the petition for an investigation of the complaint was not a reviewable action. *Id.* at 659.

Together our holdings interpreting sec. 227.15, Stats., in *Pasch* and *Wis. Environmental Decade* provide for judicial review of agency actions which are final, in the sense that they determine the further legal rights of the person seeking review. Further, they require final actions to be stated in conformance with sec. 227.10.

In the Omega Hills cases, we conclude that the requirements to the plan of operation which the DNR issued on September 10, 1980, April 6 and 30, 1981, and March 23, 1983, following impasses with Waste Management, were final decisions for the purpose of sec. 227.15, Stats. First, in contrast to the PSC's actions in *Pasch,* which did not conclusively determine the taxpayer's legal rights, the actions of the DNR in these cases do determine Waste Management's legal rights. Unless Waste Management complies with the DNR's requirements, it risks denial, suspension or revocation of its future license under sec. 144.44(4)(a). Unless Waste Management obtains judicial review of the DNR's requirements, it faces possible "irreparable injury" to its interest in its investment, in that it must incur the full costs of compliance regardless of whether the requirements are properly imposed under regulatory standards established under secs. 144.435 and 144.62. Second, we emphasize, as we observed above, that sec. 144.44(3)(c) authorizes

the DNR to approve plans of operation with conditions *only* to the extent that conditions are needed to ensure compliance of the plans with standards set under secs. 144.435 and 144.62. The DNR lacks discretion to impose any other conditions. Under sec. 144.44(3)(c), it must approve plans of operation, disapprove or approve them with conditions within 90 days of submission. It is clear to us that such a statutory scheme makes the DNR's approval, disapproval or approval with conditions a "final" decision.

Because we find that these actions of the DNR are final, we conclude that sec. 227.10, Stats., is applicable. It provides in part that "every final decision of an agency shall be in writing accompanied by findings of fact and conclusions of law." Accordingly, we find that, although the DNR did not set forth its requirements to the plan of operation in the form of a record, based on findings of fact and conclusions of law, it was under a statutory duty to do so.

For these reasons, we hold that Waste Management has a right to judicial review under sec. 227.15, Stats., of the DNR's issuance of requirements to the plan of operation for the Omega Hills site in these cases, and that the DNR is required to state its actions in conformance with sec. 227.10.

We note that Waste Management qualifies on an independent statutory ground for judicial review of the DNR's actions on March 23, 1983. Effective in 1982, sec. 144.44(3)(f), Stats., provides that: "In any judicial review under ss. 227.15 to 227.21 of the department's decision to approve or disapprove a plan of operation, no element of the feasibility report, as approved by the department, is subject to judicial review." We interpret this section to provide for judicial review under sec. 227.15 of the DNR's approvals, conditional approvals,

and disapprovals of plans of operation after May of 1982.

Had the DNR complied with sec. 227.10, Stats., in issuing its requirements to the plan of operation in these cases, we could now review the merits of the requirements. However, on this record we are unable to ascertain either the facts or the legal conclusions on which the DNR based its actions. We therefore remand this issue to the circuit court for action consistent with this opinion.

We do not reach further arguments by Waste Management on whether the DNR's actions were arbitrary and capricious or constituted an abuse of agency discretion.

*By the Court.*—Order in case no. 83–2356 reversed in part, affirmed in part and remanded. Judgment in case no. 83–2446 reversed in part, affirmed in part, and remanded. Order in case no. 84–600 affirmed on other grounds.