# WASTE MANAGEMENT OF WISCONSIN, INC., a domestic corporation, Petitioner-Appellant,

v.

# State of Wisconsin DEPARTMENT OF NATURAL RESOURCES, Respondent.

Supreme Court

*Nos. 83–2356, 83–2446, 84–600. Decided February 11, 1986.*

(Also reported in 381 N.W.2d 318.)

PER CURIAM. This opinion has been revised. Following our grant of a motion for reconsideration by Waste Management, Inc. (Waste Management), we issue this opinion. Waste Management asserted that our initial opinion, *Waste Management of Wis., Inc. v. DNR*, 126 Wis. 2d 76, 376 N.W. 2d 345 (1985), was predicated on a factual error. The error was our conclusion that the Department of Natural Resources (DNR) had not issued an initial license to Waste Management to operate a waste disposal site at its "Omega Hills" location in 1978. Because we conclude that the initial opinion was affected by that error, we withdraw that opinion.

The record, as originally presented to this court as well as to all courts below, did not contain any license to Waste Management to operate a waste disposal site at its Omega Hills location in 1978, and we therefore predicated our opinion on our conclusion that the DNR had not issued a license to Waste Management for that site. After the filing of our initial opinion, Waste Management asserted in its motion for reconsideration that the DNR granted it a license to operate the site in 1978 and annually renewed the license. In response to the motion for reconsideration, the DNR submitted copies of a license issued in 1978 and of a subsequent license. Waste Management claims that it did not submit a copy of the license because actions of the circuit courts denied it the opportunity to develop a full record. The DNR claims that it did not include a copy of the license

because it felt that licensing was not critical to resolution of the issues in these cases. For whatever reasons, the license did not appear in the record prior to the filing of our opinion. We now accept the DNR's acknowledgment that a license did exist and that the parties failed to include it in the record.

Waste Management appeals decisions of three circuit courts, all of which held that Waste Management has no due process or statutory right to a hearing before the DNR at which to challenge certain actions by the DNR involving two solid waste disposal sites which Waste Management owns. In the first case, the DNR denied Waste Management's request for a modification of a "feasibility determination" for a site known as the "Metro" site. In the other cases, the DNR imposed certain requirements on Waste Management's "plan of operation" for a site known as the Omega Hills site. In all three cases, the DNR denied Waste Management's subsequent requests for hearings on its actions.

Waste Management also appeals the courts' holdings that the DNR's actions were not judicially reviewable and that the DNR's actions were not arbitrary or capricious.

Because we conclude that Waste Management does not have an interest in its Metro feasibility determination which receives protection from the due process clause of the fourteenth amendment, and because we conclude that neither ch. 144, Stats., nor sec. 227.064 gives Waste Management a right to a hearing before the agency on a requested modification, we hold that Waste Management does not have either a constitutional or statutory right to a hearing before the DNR to challenge the DNR's denial of its request for a modification of the Metro feasibility determination.

With regard to the DNR's modifications to the plan of operation for the Omega Hills site, we hold that Waste Management's interest in its approved plan of operation does not merit due process protection, but its interest in its license to operate the Omega Hills site does merit due process protection. To the extent that the DNR's modifications constitute a deprivation of Waste Management's interest in its license, Waste Management's correspondence to the DNR in which it communicates the merit of its position and its statutory right to judicial review of the decision of the DNR under sec. 227.15, Stats., satisfies the due process requirements of notice and an opportunity to be heard. Because we hold that Waste Management has a right to judicial review under sec. 227.15, we also hold that the DNR must issue its decisions to modify requirements in conformance with the requirements of sec. 227.10.

Inasmuch as these cases involve the statutory screening process which results in licensing of solid and hazardous waste disposal sites, we begin with an overview of that statutory process. The screening process established by sec. 144.44, Stats., consists of two distinct phases. In the first phase, the DNR reviews plans for construction and operation of waste disposal sites submitted by persons seeking to license new facilities. One key requirement in the first phase is that the license applicant submit a feasibility report to the DNR and obtain a decision from the DNR that its site is feasible for the proposed use; that decision is known as the "site feasibility determination." Section 144.44(2). In some circumstances the DNR must require an applicant for a license to prepare an environmental impact statement or to submit its plan to a public hearing. Sec-

tion 144.44(1)–(4). When the DNR issues a favorable feasibility determination, the applicant is then qualified to submit a "plan of operation," which the DNR must approve, disapprove, or approve with conditions within 90 days of submission. Section 144.44(3)(c). Although sec. 144.44(3)(c) does not use the words "conditional approval," it states in part that "[a]n approval may be conditioned upon any requirements necessary to comply with the standards." The standards to which the section refers are those ". . . established under s. 144.435 or, in the case of hazardous waste treatment, . . . with the rules and standards established under s. 144.62." Section 144.44(3)(c).

In the second phase, which begins after approval of a plan of operation, an applicant with an approved plan of operation may construct a facility according to the plan up to a specified design capacity. Section 144.44(3)(d), Stats. The DNR, however, retains authority to make modifications to the plan of operation under certain specified circumstances. Section 144.44(3)(d). The DNR's approval of a plan of operation, therefore, does not automatically entitle the applicant to be licensed. Section 144.44(3)–(4). The applicant must construct the facility in accordance with the plan before the DNR will issue the initial license for the facility. Section 144.44(4)(d). The issuance of the license indicates that the applicant has satisfied all conditions relating to construction. Nonetheless, sec. 144.44(4)(a), authorizes the DNR to deny, suspend or revoke an operating license based on grievous or continuous failure of an operator to comply with the plan of operation.

The interests of applicants for an operator's license also are affected by sec. 227.064, Stats., which requires an agency to hold hearings on agency actions in

some circumstances, and sec. 227.15, which provides for judicial review of agency actions which adversely affect the substantial interests of any person.

In the Metro site case, No. 84–600, Waste Management began the screening process in 1976. On June 4, 1980, the DNR issued a favorable feasibility determination for the proposed site. On July 18, 1980, Waste Management orally requested that the DNR modify the feasibility determination to permit it to remove an additional thirty feet of clay soils from the site to be used as cover material. Removal of the soils would have lowered the base grade of the area, approximately 40 acres in size, by an additional thirty feet. According to Waste Management, its request was based on new information which indicated that the base grade could be lowered without violating criteria on which the DNR had based its feasibility determination.

The DNR denied the request on August 13, 1980. It took the position that the request was inconsistent with Waste Management's original proposal, had not been presented to the public in an environmental impact statement or at a hearing and would be an expansion of the site under ch. 377, Stats., and NR 180, Wisconsin Administrative Code. The DNR contended that a modification of this magnitude would require an entirely new feasibility determination.

By letter on September 12, 1980, Waste Management requested a contested case hearing on the denial of its request. On September 23, 1980, the DNR denied the hearing request.

Waste Management petitioned the circuit court of Milwaukee county for judicial review of the DNR's denial of its requests. It asked the court to nullify the DNR's requirement for a full review prior to a modifi-

cation of the feasibility determination and to order the DNR to make the requested change or, alternatively, to order the DNR to grant it a hearing on its request. The circuit court denied Waste Management's petition.

Cases Nos. 83–2356 and 83–2446 involve the Omega Hills site. In these cases the DNR already had issued a favorable feasibility determination. The controversy centers on the plan of operation which Waste Management submitted to the DNR and to which the DNR formally responded on June 15, 1978. In that response, the DNR "tentatively" approved the plan of operation, subject to Waste Management's fulfillment of a number of specific requirements.

In a letter dated July 7, 1978, Waste Management informed the DNR that it did not agree with all the recommendations detailed in the June 15, 1978, letter of approval. In the ensuing months and years, the contested requirements became the subject of considerable dialogue between the DNR and Waste Management. Nonetheless, on July 21, 1978, the DNR issued a license to Waste Management, authorizing Waste Management to accept waste at the Omega Hills site. The license was conditioned upon Waste Management's compliance with the provisions of any plan approval and subsequent modifications thereof.

After further dialogue with Waste Management and further evaluation of the conditions at the Omega Hills site, the DNR issued letters to Waste Management on September 10, 1980, April 6 and 30, 1981, and March 23, 1983, changing some recommendations contained in the plan approval and affirming others. Waste Management disagreed with some or all of the changes recommended by the DNR in these four letters. At each such impasse, Waste Management filed

petitions in the circuit court of Milwaukee county for judicial review of the DNR's authority to impose the requirements, and of the DNR's subsequent denials of hearings on its actions. The circuit courts denied Waste Management's petitions.

On Waste Management's appeal, all three cases were consolidated. The DNR petitioned to bypass review by the court of appeals and we granted the petition.

The issues for review are:

1) Does Waste Management have a constitutional right to a hearing before the DNR on either: a) the DNR's refusal to grant Waste Management's requested modification to its feasibility determination for the Metro site; or, b) the DNR's modifications to the requirements of the approved plan of operation for the Omega Hills site with which Waste Management disagrees?

2) Do these actions by the DNR entitle Waste Management to a hearing pursuant to sec. 144.44(3), Stats.?

3) Do these actions by the DNR entitle Waste Management to a contested case hearing pursuant to sec. 227.064, Stats.?

4) Are these DNR actions judicially reviewable pursuant to sec. 227.15, Stats., and, if so, is the DNR required to state such actions in conformance with sec. 227.10?

*Issue 1: Whether Waste Management has a constitutional right to a hearing before the DNR on the DNR's actions.*

Waste Management asserts that secs. 144.44(3)(c) and (d), Stats. 1979, confer on it interests in its feasibility determination for the Metro site and in its approved plan of operation and license for the Omega Hills site which are protected by the due process clause of the fourteenth amendment to the United States Constitution.

The DNR argues that Waste Management has no interest in its feasibility determination, approved plan of operation or license which merits due process protection.

The United States Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564 (1972), stated that the due process clause of the fourteenth amendment protects some benefits conferred on persons by state law. We note, however, that *Roth* does not suggest that every interest conferred by state law is a protected interest. Accordingly, we first ask whether the law of this state, specifically ch. 144, Stats., confers on Waste Management an interest which merits due process protection and whether the DNR's actions constitute a deprivation of that interest.

In *Roth,* a teacher with a contract to teach at a state university for one year argued that failure of the university to advise him of reasons for not rehiring him at the end of his term deprived him of a protected "property" interest. The Court disagreed. It stated that "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Id.* at 576. The Court described certain attributes of

property interests and the purpose of due process protection: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577.

Accordingly, the court examined the terms of Roth's appointment, relevant state statutes, and rules and policies of the university to determine whether any of these secured in Roth an interest in reemployment or created a legitimate claim of entitlement to it. *Id.* at 578. Because the Court found that the terms of the appointment did not assure Roth that the university would give him reasons for nonrenewal or a hearing on its decision not to rehire him, it held that he lacked an interest sufficient to require a hearing on his nonrenewal. *Id.* at 578. *Roth* makes clear that the terms and conditions which define a person's benefit under state law also determine whether the benefit is a protected interest under the fourteenth amendment.

Since *Roth*, the United States Court of Appeals for the Seventh Circuit has applied the *Roth* definition of a protected interest in one case with facts somewhat analogous to the facts in these cases. In *Molgaard v. Town of Caledonia*, 696 F. 2d 58 (7th Cir. 1982), the court affirmed a district court's holding that property owners who had been granted a conditional approval of a plan for a mobile home park by a town board had no constitutionally protected interest in completion of the proposed park project in accordance with the plan. *Molgaard* at 59.

The district court based its holding on its conclusion that the underlying plan approval was not a final approval for the owners' project. The court described

the approval as "highly contingent." It stressed that the approval contained seven conditions and that the owners had not been awarded a license to operate the proposed mobile home park. *Molgaard v. Town of Caledonia,* 527 F. Supp. 1073, 1080 (E.D. Wis. 1981). It wrote:

". . . plaintiffs argue that once the town board approved the plans, they had a property interest . . . to complete the project in accordance with those plans. This argument ignores the facts of this case. The *plaintiffs never received final, unconditional approval of their project;* the town in effect said that the plans submitted were acceptable as far as they went, but that other matters had to be addressed prior to approval. In addition, several of the conditions were beyond the plaintiffs' control. I find that the plaintiffs only had a unilateral expectation that the plans might be approved; they had no cognizable property interest." (Emphasis added.)

The analysis of the district court in *Molgaard* serves as a guide for our analysis of whether sec. 144.44, Stats., confers on Waste Management a protected interest in its feasibility determination for the Metro site, its approved plan of operation for the Omega Hills site, or its license to operate the Omega Hills site.

With respect to the Metro site case, involving Waste Management's requested modification of its favorable feasibility determination, sec. 144.44(2)(a), Stats. 1979 provides:

"Prior to constructing or establishing a site for the land disposal of solid waste or a site for the treatment, storage or disposal of hazardous waste, the applicant shall submit to the department a feasibility report describing the physical conditions of the proposed site.

72

The purpose of the report and review of the report under this subsection is to determine whether the site has potential for use in solid waste disposal or hazardous waste treatment, storage or disposal and to establish any conditions which the applicant must include in the plan of operation submitted under sub. (3). *Favorable feasibility determination under this subsection does not guarantee plan approval under sub. (3) or licensure under sub. (4).*" (Emphasis added.)

The emphasized language indicates that all Waste Management has, as the holder of a favorable feasibility determination, is an opportunity to move ahead in the screening process. Although Waste Management's briefs frequently refer to its feasibility determination as a "plan approval," sec. 144.44(2)(a), Stats., makes it very clear that a "favorable feasibility determination" is not the same as a "plan approval." As the holder of a favorable feasibility determination, Waste Management has neither an approved plan of operation nor a license to operate, nor has it in any manner an assurance that it will receive either.

Clearly the interest which the state confers on the holder of a favorable feasibility determination under sec. 144.44(2)(a) and (3)(c), Stats., fails to meet the threshold for a protected interest under the due process clause as interpreted in *Roth* and *Molgaard.* The favorable feasibility determination does not secure an interest in any state benefit. It is conditional on its face. Failure of the holder to comply with conditions in the feasibility determination may extinguish the interest, as may the discovery of new physical conditions at the site. Any expectation that the holder of a determination has that the DNR will later approve a plan

of operation or eventually grant a license based on the feasibility determination is "unilateral." Accordingly, we hold that Waste Management's interest in its favorable feasibility determination does not merit due process protection.

With respect to the Omega Hills site cases, although we acknowledge that Waste Management has an interest in its business investment in the Omega Hills site, we note that Waste Management's due process right to operate its facility free from DNR modifications must arise from either the DNR's approval with conditions of its plan of operation or from the DNR's issuance of a license.

The DNR formally responded to Waste Management's proposed plan of operation on June 15, 1978. In a letter dated June 15, 1978, the DNR advised Waste Management that:

". . . the staff's opinion is that your proposal should provide for a satisfactory solid waste disposal operation *provided* the recommendations in the attached Division Report are followed. The site and operating plan are, therefore, *tentatively* approved *subject* to compliance with Chapter NR 151, Wisconsin Administrative code, and *to fulfillment of the recommendations* listed in the attached Division Report." (Emphasis added.)

The record shows that the letter went on to state:

"These sites will be constructed in many phases. When you have completed your site preparations for each phase and you have fulfilled the conditions of this approval listed under *Site Preparation,* please contact the . . . office and arrange for a field inspection of this site. District personnel will inspect the site to determine the extent and completeness of the site prepara-

tion. If the site has been prepared in accordance with the engineering plans submitted and this approval, the District will recommend that filling be authorized in those areas. Your license will be issued shortly and this approval will be made part of the license. No waste is to be deposited above the final grades as specified in the Lauer 2 continued use plan dated May 10, 1977 before the license has been issued."

In its attached report the DNR set forth 44 specific recommendations. These recommendations related to the construction, operation and abandonment of the site, ending with condition number 44, an all-inclusive condition which stated:

"All portions of this approval are subject to change in conjunction with the detailed review of the monitoring results from both leachate and gas and continuous review of the site operations and working of the plans in the field, other environmental concerns, Chapter NR 151, Wisconsin Administrative Code, other applicable provisions of Chapter 377, Laws of 1977, State of Wisconsin, Laws of 1976 PL–94–500; the Resource Recovery and Conservation Act, if the Department determines it necessary."

Although this letter and the attached report referred to these requirements as "recommendations," both the letter and the attachment make it clear that these recommendations were mandatory requirements, and that these requirements were subject to further modification under certain circumstances. Although the briefs and arguments submitted to this court referred to the plan as an "approved plan of operation," the record indicates that the DNR made it clear from the beginning that any approval was subject to

Waste Management's compliance with the specified requirements and was subject to further modification.

■ The circuit courts found that Waste Management's interest in its plan of operation was a "conditional" interest under the due process clause. We agree. We interpret the June 15, 1978, letter as notice to Waste Management that the DNR's approval was conditioned upon Waste Management's meeting the requirements set forth in the approval letter and that Waste Management could expect further modifications. Waste Management did not have a legitimate claim of entitlement to operate the Omega Hills site according to the plan of operation free from further modifications. The DNR approval of June 15, 1978, was conditioned expressly upon Waste Management's satisfaction of several requirements. Further, both the approval letter and sec. 144.44(3)(d), Stats., inform Waste Management that the plan of operation is subject to modification. Just like the plaintiffs in *Molgaard,* Waste Management has only a unilateral expectation that the approved plan of operation is final and that they can operate the Omega Hills site free from further modification by the DNR. Accordingly, we hold that Waste Management's interest in the approved plan of operation does not merit due process protection.

■ In July, 1978, the DNR issued a license to Waste Management to accept waste at its Omega Hills site. The license expressly states that it is,

". . . conditioned upon and subject to compliance with the provisions of any order issued to the licensee during the term of the license (and upon compliance with the provisions of any plan approval and subse-

quent modifications thereof made for the facility in writing by the department), which shall be deemed incorporated herein by reference."

Section 144.44(4)(b), Stats. 1977, which was in effect when the DNR licensed the Omega Hills site, provides that "[t]he initial operating license for a site for the land disposal of solid waste or the treatment, storage or disposal of hazardous waste shall not be issued unless the site has been constructed in substantial compliance with the operating plan approved under sub. (3)." We noted earlier that some of the requirements in the approval of the plan of operation relate to construction, while others relate to operation or abandonment. Section 144.44(4)(b) suggests, and the DNR acknowledges, that the issuance of the license indicates that the licensee has satisfied the recommendations relating to construction. The license, however, remains conditioned ". . . upon compliance with the provisions of any plan approval and subsequent modifications thereof . . ." and does not create in Waste Management a legitimate claim of entitlement to operate the Omega Hills site free from any modifications. Rather, the license creates in Waste Management a legitimate claim of entitlement to operate the site free only from modification of the conditions regarding the construction of the site. We hold, therefore, that Waste Management's interest in its license to operate the Omega Hills site constitutes a property interest which merits due process protection to the extent that Waste Management is legitimately entitled to operate its Omega Hills site free from modification of the conditions of construction.

Having determined that the only interest of Waste Management which merits due process protection is its

interest in the license to operate the Omega Hills site free from modifications of conditions of construction, we now must determine whether the DNR's actions constitute a deprivation of that interest. If the DNR's actions to constitute a deprivation of Waste Management's interest, then we must determine what procedural protection is due.

In its letters of September 10, 1980, April 6 and 30, 1981, and March 23, 1983, the DNR discusses the 44 recommendations contained in the original plan approval, reaffirming some of the recommendations and modifying others. The DNR's modifications constitute a deprivation of Waste Management's interest in its license if, and to the extent that, the modifications alter recommendations relating to construction that were contained in the original approval of the plan of operation.

Due process dictates that a deprivation of a protected interest ". . . be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 313 (1950). "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Cleveland Board of Education v. Loudermill*, 53 U.S.L.W. 4306, 4309 (March 19, 1985).

To determine the appropriate form of hearing, we must balance the competing interests at stake:

"First, the private interest that wil be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Govern-

ment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

The government's interest is in protecting the health and welfare of the people by regulating the construction and operation of waste disposal sites to assure against contamination of the environment. Waste Management's private interest is in operating its Omega Hills site as constructed and avoiding the cost of altering the original design of the site.

In operating a waste disposal site according to state and federal regulation, however, Waste Management not only promotes its business interest, it also serves a public interest, disposal of society's waste in an environmentally sound manner. As a public servant, Waste Management has a responsibility to perform its business function in a manner that protects the health and welfare of the citizenry. To protect the health and welfare of the citizenry, Waste Management must conduct its affairs in a way that minimizes the pollution costs society must bear. To minimize the immediate and latent pollution costs society must bear, Waste Management must absorb or internalize the costs of necessary pollution control.

In essence, therefore, the government's interest is in supervising Waste Management to make sure Waste Management fulfills its responsibility to the public by absorbing pollution control costs in its operation of its landfills rather than passing the costs of pollution on to society in the form of environmental contamination. The constitutional guarantee of due process offers Waste Management an opportunity to challenge the reasoning of the DNR's decisions and thereby assures

Waste Management that the DNR will act within its statutory authority in exercising its supervisory and regulatory powers.

As noted earlier, the due process clause requires that a person be given "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken." *Cleveland Board of Education* at 4309. Here, Waste Management engaged in correspondence with the DNR on several occasions detailing its reasons for believing that the DNR's requirements were unwarranted. In responding to Waste Management's concerns, the DNR offered reasons in support of its modifications. We conclude that this type of exchange, if supplemented by judicial review, sufficiently minimizes the risk of an erroneous deprivation of Waste Management's interest. Additional procedural safeguards, such as a full-fledged evidentiary hearing before the DNR, would impose a substantial additional fiscal and administrative burden upon the state without a corresponding decrease in the risk of an erroneous decision.

Unfortunately, Waste Management did not receive judicial review of the DNR's decisions in these cases. Because Waste Management did not receive judicial review of the DNR's decisions, it has no assurance from a neutral decisionmaker that the DNR acted within its statutory authority. As a result, Waste Management was denied due process in these cases.

As we hold in part IV of this opinion, sec. 227.15, Stats., affords Waste Mangement the right to judicial review of the DNR's decisions to modify requirements contained in the initial approval of the plan of operation for Omega Hills. On remand, Waste Manage-

ment's statutory right to judicial review will cure the constitutional deprivation found in these cases.

*Issue 2: Whether Waste Management has a right to a hearing before the DNR on the DNR's actions under sec. 144.4(3), Stats.*

In order to determine Waste Management's rights under sec. 144.44, Stats., we must construe several sections of ch. 144. The construction of statutes in relation to a given set of facts is a question of law. *State v. Clausen,* 105 Wis. 2d 231, 243, 313 N.W. 2d 819 (1982). This court must decide questions of law independently without deference to the decision of the trial court. *Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 537, 345 N.W. 2d 389 (1984).

In the Metro site case, Waste Management argues that its favorable feasibility determination for the site is the equivalent of a plan of operation "approval." According to Waste Management, therefore, the feasibility determination entitles it to a hearing under sec. 144.44(3)(c) and (d), Stats., which it construes as requiring the DNR to hold hearings on modifications of "approvals." It cites the following sentence from the section to support its position: "Any approval may be modified by the department upon application of the licensee if newly discovered information indicates that the modification would not inhibit compliance with the standards adopted under s. 144.435 or, if applicable, s. 144.62."

The DNR contends that sec. 144.44(3)(c), Stats., is inapplicable to a site feasibility determination. We agree. That section follows sec. 144.44(3)(a), which states that "[a]ny person who has obtained a favorable

determination of site feasibility may submit to the department a proposal plan of operation for the site." Section 144.44(3)(c) provides:

"(c) Within 90 days after a complete plan of operation is submitted, the department shall either approve or disapprove the plan in writing. The determination of the department shall be based upon compliance with the standards established under s. 144.435 or, in the case of hazardous waste treatment, storage or disposal sites, with the rules and standards established under s. 144.62. . . . An approval may be conditioned upon any requirements necessary to comply with the standards. Any approval may be modified by the department upon application of the licensee if newly discovered information indicates that the modification would not inhibit compliance with the standards adopted under s. 144.435 or, if applicable, s. 144.62."

The words "approval" and "disapproval" in this section, contrary to the assertion of Waste management, refer only to approvals, approvals with conditions, or disapprovals of plans of operation. This section does not use these terms to describe a feasibility evaluation report. In all respects, this section unambiguously addresses only approval or disapproval of plans of operation, not feasibility reports. Therefore, sec. 144.44(3)(c), Stats., is inapplicable.

We need not reach Waste Management's arguments in regard to sec. 144.44(3)(d), Stats., because subsection (3)(d) relates back to the preceding subsection. It begins: "Approval under par. (c) entitles the applicant. . . ." Because subsection (c) applies only to plans of operation, and not feasibility reports, subsection (d) is inapplicable to a feasibility report as well. Accord-

82

ingly, we hold that secs. 144.44(3)(c) and (d) do not entitle Waste Management to a hearing before the DNR on the DNR's refusal to modify its feasibility determination.

The Omega Hills site cases involve the controversy over requirements which the DNR imposed when it approved the plan of operation for the site on June 15, 1978, subject to Waste Management's compliance with a number of specific requirements. Following requests by Waste Management for changes in certain requirements on July 7, 1978, and September 7, 1978, and extensive discussion of requirements by Waste Management and the DNR, the DNR issued changes in some requirements on September 10, 1980. Similarly, it issued changes in requirements on April 6 and 30, 1981, and March 23, 1983. In general, the changes related to requirements for ground water monitoring, collection and treatment of toxic liquids and other specific aspects of the preparation, construction and operation of the site. Some changes set different deadlines for Waste Management to meet specific requirements and to make reports to the DNR. Notwithstanding the modifications, the approval remained conditioned upon the fulfillment of the requirements.

According to Waste Management, sec. 144.44(3)(d), Stats., requires the DNR to hold a hearing to establish specific reasons for modifying Waste Management's approved plan of operation. Basically, Waste Management asserts that, because sec. 144.44(3)(d) contains a statement of the DNR's burden of proof, it implicitly creates a right to a hearing.

Section 144.44(3)(d), Stats., provides:

"(d) Approval under par. (c) shall entitle the applicant to construct and operate the site in accordance

83

with the approved plan for not less than the design capacity specified in the determination of site feasibility, unless the department establishes *by clear preponderance of the credible evidence* that:

"1. The site is not constructed in accordance with the approved plan;

"2. The site poses a substantial hazard to public health or welfare; or

"3. In-field conditions, not disclosed in the feasibility report or plan of operation, necessitate modifications of the plan to comply with standards in effect at the time of plan approval under s. 144.435 or, if applicable, s. 144.62." (Emphasis added.)

Section 144.44(3)(d), Stats., unambiguously sets out the rights of applicants whose plans have been approved. It does not provide applicants with a hearing on DNR modifications. It provides that the DNR establish "by a clear preponderance of the credible evidence" that any DNR modifications to the approved plan of operation, as conditioned in the initial approval, are necessitated by one of the three circumstances in the section. The legislature simply has expressed its intention that under sec. 144.44(3)(d), DNR decisions receiving judicial review must satisfy the "clear preponderance of the credible evidence" test rather than the "substantial evidence" test used to review most agency decisions. *See* sec. 227.20(6). Accordingly, we hold that sec. 144.44(3)(d) does not entitle Waste Management to a prior hearing on the DNR's decisions to modify the requirements imposed in the initial approval of Waste Management's plan of operation for the Omega Hills site.

*Issue 3: Whether Waste Management has a right to a hearing on the DNR's actions under sec. 227.064, Stats.*

Waste Management contends that sec. 227.064, Stats. 1979, entitles it to a contested case hearing before the DNR on both the DNR's refusal to modify the site feasibility determination for the Metro site and on the DNR's requirements in the conditionally approved plan of operation for its Omega Hills site with which Waste Management disagrees. It argues that it satisfies the qualifying conditions under this section and is not excepted from coverage by subsections (3) and (5). The DNR argues that Waste Management does not meet the qualifying conditions of the section and that subsections (3) and (5) exempt these actions.

As we decided in *Milwaukee Met. Sewerage Dist. v. DNR,* 126 Wis. 2d 63, 375 N.W. 2d 648 (1985), sec. 227.064, Stats., confers a right to a contested case hearing before an administrative agency on persons who meet its criteria for standing unless exceptions in subsections (3) or (5) apply.

Section 227.064(3), Stats., provides in part: "This section does not apply to . . . actions where hearings at the discretion of the agency are expressly authorized by law." Subsection (3) clearly makes sec. 227.064 inapplicable to an action of an administrative agency if the agency has legal authority to hold hearings on the action at its discretion.

In regard to the Metro site, sec. 144.431(2)(a), Stats., governs any right of Waste Management to a hearing on its feasibility determination. It provides that the DNR ". . . may: (a) Hold hearings relating to any aspect of the administration of ss. 144.43 to 144.47. . . ." In this section use of the word "may" clearly gives

the DNR discretion to hold a hearing and does not require the DNR to do so. Because we conclude that the DNR has discretion to hold a hearing and that subsection (3) is therefore applicable, we hold that Waste Management has no right to a contested case hearing under sec. 277.064 at which to challenge the DNR's refusal of its request for a modification of a feasibility determination.

Section 144.431(2)(a), Stats., similarly controls our analysis with regard to the DNR's modifications to the requirements contained in the approved plan of operation for the Omega Hills site. As in the Metro site case, sec. 144.431(2)(a) gives the DNR discretion to hold a hearing and does not require the DNR to do so. Accordingly, we hold that Waste Management has no right to a contested case hearing under sec. 227.064 at which to challenge the DNR's modifications to the requirements contained in the initial approval of the plan of operation for the Omega Hills site. Having found that the DNR's actions were excepted from coverage by sec. 227.064(3) we need not determine whether Waste Management meets the qualifying conditions in sec. 227.064, nor need we determine Waste Management's rights under sec. 227.064(5).

*Issue 4: Whether these DNR actions are judicially reviewable under sec. 227.15, Stats., and whether the DNR must state such actions in conformance with sec. 227.10.*

In the Metro site case, the circuit court found that it lacked jurisdiction over the DNR's refusal to modify Waste Management's feasibility determination because Waste Management failed to petition for review

of the action in a timely manner. In the Omega Hills site cases, the circuit courts held that the DNR's changes in requirements in the conditionally approved plan of operation were not judicially reviewable under sec. 227.15, Stats., because they were not "final decisions." According to the courts, the actions could not be considered final decisions unless they contained findings of fact and conclusions of law as required of final decisions under sec. 227.10.

Waste Management argues that the circuit courts erred in so holding. The DNR does not dispute the reviewability of its actions in the Omega Hills cases, but does argue that the actions need not conform to sec. 227.10, Stats.

With respect to the Metro site, Waste Management does not challenge the circuit court's holding that its petition for judicial review did not comply with the requirement of sec. 227.16(1)(a), Stats., for timely filing. Therefore, we affirm the holding without reaching its merits.

In regard to the Omega Hills cases, we note the right of judicial review is entirely statutory, and that orders of administrative agencies are not reviewable unless made so by statute. *Wis. Environmental Decade v. Public Service Comm.,* 93 Wis. 2d 650, 657, 287 N.W. 2d 737, (1980). Section 227.15, Stats., provides for judicial review of administrative agency "decisions" which adversely affect the "substantial interests" of a person, with certain exceptions which are not applicable to these cases. It states: "Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or

negative in form, are subject to review as provided in this chapter. . . ."

Standing to seek review of an administrative action under secs. 227.15 and 227.16, Stats., depends on a showing by the petitioner of a direct injury to its legally protected interests. *Public Intervenor v. DNR,* 115 Wis. 2d 28, 35, 339 N.W. 2d 324 (1983). In the Omega Hills cases the DNR does not challenge Waste Management's standing for the purpose of sec. 227.15. Therefore, in order to decide whether Waste Management has a right to judicial review of the DNR's changes in requirements in the plan of operation for the Omega Hills site in 1980–83, we must determine only whether the DNR's actions constitute "decisions" under sec. 227.15.

In *Pasch v. Department of Revenue,* 58 Wis. 2d 346, 353, 206 N.W. 2d 157 (1973), we restated the established test for whether an agency determination constitutes a decision entitled to judicial review. We interpreted sec. 227.15, Stats., as providing that only those administrative actions which directly affect the legal rights, duties or privileges of a person are reviewable. *Id.* at 355. We observed that it was not the legislature's intent to authorize the review of "mere preliminary action" on the part of an agency. *Id.* at 355–56. Instead, the legislative intent was to limit judicial review of administrative agency actions to "final orders" of the agency. *Id.* at 353. We wrote:

". . . neither the form of the order nor the label of 'final' or 'interlocutory' necessarily determines its character as to reviewability. . . .

" '. . . The ultimate test of reviewability is not to be found in an overrefined technique, but in the need

of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow. . . .' " *Id.* at 356.

We distinguished the facts underlying our earlier holding in *Neu's Supply Line v. Department of Taxation,* 39 Wis. 2d 584, 159 N.W. 2d 742 (1968), which determined that an order of the Department of Taxation denying relief from a subpoena duces tecum was reviewable as an order directly affecting the legal rights, duties and privileges of the party challenging the order, from the facts of the case on appeal. In *Pasch* we found that an order of the Department of Revenue finding that it had jurisdiction to proceed to a hearing on the merits of its assessment of taxes against a taxpayer did not directly affect the taxpayer's legal rights, duties or privileges, in that the taxpayer, unlike the subpoenaed party in *Neu's Supply Line,* retained the right to challenge jurisdiction after a final determination by the Department of Revenue on the merits of the controversy. *Pasch* at 356–57. Accordingly, we held that the Department of Revenue's denial of a taxpayer's request for an abatement of taxes pending further departmental review of its assessment was not a judicially reviewable action. *Id.* at 356–57.

In *Wis. Environmental Decade* we again considered the requirement that actions of an agency be final in order to be reviewable under sec. 227.15, Stats. In that case we reviewed an order of the Public Service Commission (PSC) which denied the request of a public interest organization for investigation of some complaints about the winter rates of utilities. We observed that sec. 227.15 envisions review of decisions ". . .

which must be supported by a *record* and be based upon *findings of fact* and *conclusions of law* as required by sec. 227.10." *Id.* at 659a. Finding that the PSC's order was not a final decision and was not in the format required for a final decision under sec. 227.10, we held that the PSC's order denying the petition for an investigation of the complaint was not a reviewable action. *Id.* at 659.

Together our holdings interpreting sec. 227.15, Stats., in *Pasch* and *Wis. Environmental Decade* provide for judicial review of agency actions which are final, in the sense that they determine the further legal rights of the person seeking review. Further, our decisions require final actions to be stated in conformance with sec. 227.10.

In Omega Hills cases, we conclude that the modifications to the requirements of the plan of operation which the DNR issued on September 10, 1980, April 6 and 30, 1981, and March 23, 1983, following impasses with Waste Management, were final decisions for the purposes of sec. 227.15, Stats. In contrast to the PSC's actions in *Pasch,* which did not conclusively determine the taxpayer's legal rights, the actions of the DNR in these cases do determine Waste Management's legal rights. Unless Waste Management complies with the DNR's requirements, it risks denial, suspension or revocation of its license under sec. 144.44(4)(a). Absent judicial review of the DNR's modifications, Waste Management faces possible "irreparable injury" to its interest in its investment, in that it must incur the full costs of compliance regardless of whether the requirements are properly imposed under the standards established under sec. 144.44(3)(d).

Because we find that these actions of the DNR are final, we conclude that sec. 227.10, Stats., is applicable. It provides in part that "[e]very . . . final decision of an agency . . . shall be in writing accompanied by findings of fact and conclusions of law." Accordingly, we find that, although the DNR did not set forth its requirements to the plan of operation in the form of a record, based on findings of fact and conclusions of law, it was under a statutory duty to do so.

For these reasons, we hold that Waste Management has a right to judicial review under sec. 227.15, Stats., of the DNR's modifications of requirements to the plan of operation for the Omega Hills site in these cases, and that the DNR is required to state its actions in conformance with sec. 227.10. Further, as we noted in our discussion of sec. 144.44(3)(d), the reviewing court should judge the DNR's actions under the "clear preponderance of credible evidence" test rather than the "substantial evidence" test used to review most agency decisions.

Had the DNR complied with sec. 227.10, Stats., in issuing its requirements to the plan of operation in these cases, we could now review the merits of the requirements. However, on this record we are unable to ascertain either the facts or the legal conclusions on which the DNR based its actions. We therefore remand this issue to the circuit court for action consistent with this opinion.

Because of the conclusions we have reached, we need not consider arguments by Waste Management alleging the DNR's actions were arbitrary and capricious or constituted an abuse of agency discretion.

Opinion filed on October 29, 1985, is withdrawn. Order in Case No. 83–2356 reversed in part, affirmed

in part and remanded. Judgment in Case No. 83–2446 reversed in part, affirmed in part and remanded. Order in Case No. 84–600 affirmed on other grounds.

ABRAHAMSON, SHIRLEY S. concurs. (No opinion filed.)