Mark A. CHAPMAN, Plaintiff-Respondent,

v.

LABOR & INDUSTRY REVIEW COMMISSION and Department of Natural Resources, Defendants-Appellants,

OTIS RAND WOOD PRODUCTS and Gene Thompson, Defendants.

Court of Appeals

*No. 89-1909. Orally argued March 21, 1990.—Decided April 10, 1990.*

(Also reported in 456 N.W.2d 637.)

On behalf of defendants-appellants, the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, and *Stephen M. Sobota ,* assistant attorney general, and oral argument by *Stephen M. Sobota .*

On behalf of plaintiff-respondent, the cause was submitted on the brief and oral argument by *Timothy T. Sempf* of *Novitzke & Gust* of Amery.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. The Labor and Industry Review Commission (LIRC) and the Department of Natural Resources (DNR) appeal a circuit court ruling reversing LIRC and holding that Mark Chapman was eligible for worker's compensation benefits. LIRC and DNR argue that the circuit court erred when it held as a matter of law that Chapman, who was injured while cutting timber on DNR property, was performing services for DNR that were integrally related to its functions. In this case, that determination requires DNR to pay worker's compensation benefits to Chapman. We conclude that LIRC's determination was incorrect as a matter of law and, therefore, affirm the circuit court's grant of benefits.

DNR sold rights to cut timber in Governor Knowles State Forest to Otis Rand. Rand was to pay the state in accordance with the amount of timber cut. The contract between DNR and Rand required Rand to provide certification of adequate worker's compensation coverage for his workers. Rand hired Gene Thompson to assist him, and Thompson, in turn, hired Chapman, who was injured while cutting timber on the site. Neither Rand nor Thompson carried worker's compensation coverage that covered Chapman.

288

At a hearing before an administrative law judge (ALJ), DNR presented undisputed testimony about DNR's role, its forest managery objectives and the mechanics of letting contracts to cut timber. Based largely on this testimony, Chapman's claim against DNR pursuant to the "contract under" statute, sec. 102.06, Stats., was denied by the ALJ, and by LIRC on appeal.[1] The circuit court reversed, holding that the ALJ and LIRC erred as a matter of law by misapplying the "contract under" test to the facts of this case.[2]

■

Administrative orders are not reviewable unless made so by statute. *Waste Management v. DNR*, 128 Wis. 2d 59, 87, 381 N.W.2d 318, 330 (1986) (per curiam). *But cf. State ex rel. First Nat'l Bank*, 82 Wis. 529, 544–45 n.10, 263 N.W.2d 196, 203 n.10 (1978) (certiorari review available in the absence of statutory right). Section 102.23, Stats., establishes the nature and extent of judicial review of LIRC's decisions in worker's compensation matters and governs the scope of this court's review.

---

[1]Section 102.06, Stats., provides in part:

An employer shall be liable for compensation to an employe of a contractor or subcontractor under the employer who is not subject to this chapter, or who has not complied with the conditions of s. 102.28(2) in any case where such employer would have been liable for compensation if such employe had been working directly for the employer, including also work in the erection, alteration, repair or demolition of improvements or of fixtures upon premises of such employer which are used or to be used in the operations of such employer.

[2]We refer to DNR as a "contractor over" and Rand as a "contractor under" when discussing the application of sec. 102.06. While prior cases refer to the statute in both ways, for the purpose of consistency we refer to sec. 102.06, Stats., as the "contract under" statute throughout this opinion.

Recently our supreme court issued an opinion that clarifies the standard to be applied in examining agency determinations of law and mixed questions of law and fact. In *Drivers Local No. 695 v. LIRC,* 154 Wis. 2d 75, 452 N.W.2d 368 (1990), the court examined LIRC's application of the term "wages" to union dues refunds under the Wisconsin Unemployment Compensation Law. The court determined that when applying that definition to a novel fact situation, no deference should be given to the agency's determination:

> There is nothing in this case to suggest that the Commission has had any experience in interpreting the statute as measured against these facts of first impression. Nor, as explained in *American Motors Corp. v. ILHR Dept.,* 101 Wis. 2d 337, 353–54, 305 N.W.2d 62 (1981), is there any evidence of the promulgation of administrative rules pertinent to the interpretation of the statute in light of the facts here. Most importantly, special deference to be afforded an agency is the result of a course of uniform interpretation over a period of time. Where a legal question is concerned and there is no evidence of any special expertise or experience, the weight to be afforded an agency interpretation is no weight at all. . . . Here, the standard of review must necessarily be *de novo.*

*Id.* at 10–11.

Here, although LIRC is charged with applying sec. 102.06, Stats., there is no evidence that it has applied the statute to a fact situation similar to the one in this case, much less applied it consistently and over a long period of time. LIRC has not demonstrated that it developed or interpreted rules refining or interpreting the statutory language. The application of sec. 102.06 to a set of facts is a question of law that is reviewable by this court.

*Maryland Cas. Co. v. DILHR,* 77 Wis. 2d 472, 475, 253 N.W.2d 228, 230 (1977). Consequently, although we accept LIRC's findings of fact, our review of its legal conclusions is de novo.

■

Applying this standard, we conclude that LIRC's interpretation of sec. 102.06, Stats., is erroneous. The purpose of sec. 102.06 is "to protect employees of irresponsible and uninsured subcontractors by imposing ultimate liability on the presumably responsible principal contractor, who has it within his power, in choosing subcontractors, to *pass upon their responsibility and insist upon appropriate compensation protection* for their workers." *Green Bay Packaging, Inc. v. DILHR,* 72 Wis. 2d 26, 37, 240 N.W.2d 422, 429 (1976) (quoting 1A Larson, *Workmen's Compensation Law,* ch. IX, sec. 49.11). (Emphasis in original.) *Green Bay Packaging* defines a contractor under as "one who regularly furnishes to a principal employer materials or services which are integrally related to the finished product or service provided by that principal employer." *Id.* at 36, 240 N.W.2d at 428. We conclude that Chapman was providing service integral to a DNR function and accordingly is eligible for worker's compensation benefits under sec. 102.06.

The first requirement under the *Green Bay Packaging* test is that the contractor, Rand, provide "materials or services" to the principal employer, DNR. LIRC found "the state has not contracted with anyone to perform services on its behalf in this situation. The state has merely sold to applicant's employers the timber in selected areas of the state's forests, the timber to be severed from the land and removed by the purchasers." We disagree with this legal conclusion.

291

In relying heavily on the contract between DNR and Rand, LIRC has elevated form over substance. Although the contract gives some indication of the status of the parties, it is not controlling. *See Schmidlkofer v. Industrial Comm'n,* 265 Wis. 535, 539, 61 N.W.2d 862, 865 (1953). While not every contractual relationship requires a finding of contract under liability, here the facts warrant finding more than a simple buyer-seller relationship.

LIRC's decision relied heavily on the fact that Rand was paying DNR, rather than vice-versa. This fact alone does not necessitate a finding that Rand was not supplying DNR with a service. In *Maryland Casualty,* the court found that a franchisor was a contractor over, despite the fact that it had been paid by the franchisee for its name and expertise. The court held that the franchisee had provided a service integrally related to those provided by the franchisor. *Id.* at 477–78, 253 N.W.2d at 231–32. Likewise, as the state acknowledges, the fact that Rand paid DNR is not enough, in and of itself, to find that no service was performed.

The test articulated in *Green Bay Packaging* does not distinguish between the manner in which the products or services are supplied, and we see no need for such a distinction. We hold that Rand provided a service by cutting and removing timber from DNR land. Although Rand paid for the right to possession of this timber, harvesting it was still a service that helped effectuate DNR's goal of sound forest management.

The second element in the *Green Bay Packaging* test is that these services be performed "regularly." Neither LIRC nor the ALJ relied on the absence of this factor in reaching their determinations. The record provides ample evidence that Rand regularly bid on and won DNR timber cutting contracts and was operating under

a two-year cutting contract at the time. The second element is met.

Finally, Chapman must demonstrate that Rand's activities were "integrally related" to the services provided by DNR. The accident occurred on DNR land. DNR is required to manage this land in light of certain statutory objectives. Sec. 28.04, Stats.[3] The primary use of state forests is growing recurring forest crops. *Id.* The circuit court concluded that Rand was cutting and removing timber from a state forest, thereby assisting DNR in fulfilling its goal of forest management.

LIRC and DNR counter by presenting testimony from Michael Giles, a DNR forest superintendent, that DNR has many goals and obligations; that sound forest management does not necessarily rely on the harvest and that the state forest system is not dependent on the sale of timber. Giles also testified that forestry and recreation are the dual objectives of the state forest system and part of DNR's broader goal of managing the state's resources. He testified that cutting, in certain circumstances, is

---

[3]Section 28.04(1) provides:

> **Management of state forests.** (1) Purpose. The primary use of forests is silviculture and the growing of recurring forest crops, with scenic values, outdoor recreation, public hunting and stabilization of stream flow as extra benefits. Forests are productive properties which contribute to employment in the woods and mills, provide commodities essential to national defense and consumers' needs, and earn returns on the investment. However, full recognition must be given to the principle of multiple use, including designation of special use tracts ranging from natural areas receiving a high degree of protection to recreation sites with appropriate facilities.

"Silviculture" is defined in Webster's Third New International Dictionary 2120 (Unabr. 1976), as "a phase of forestry that deals with the establishment, development, reproduction, and care of forest trees."

293

desirable for maintaining deer population and encouraging new forest growth. He stated that there is a ten-year master plan for the state forest system that includes the production of forest products and that there is a fifty-year cutting schedule for the state forests. Finally, he stated "there are a large number of loggers needed to do the job DNR has decided to do."

LIRC and DNR misconstrue the test in *Green Bay Packaging*. The test requires that the timber cutting be integrally related to *a service* provided by DNR. The question is not whether timber cutting is an integral part of DNR's total mission or plays a significant role in generating income. Instead, the test is whether the timber cutting was integrally related to DNR's more limited role of managing the state forest system.

We are not faced here with a situation that required balancing conflicting testimony or determining the credibility of a witness. DNR has a statutory obligation to manage the state's forests with the primary goal being the growing of recurring forest crops. Giles' undisputed testimony that the master plan for the state forest system included the growing of forest products and that a cutting schedule for the forests existed bolsters this argument. Timber cutting is an important role to be performed in DNR's function of managing the state's forests. Contracting this role to others, in whatever manner, does not lessen its importance. It was error for LIRC to conclude that timber cutting was not integrally related to DNR's forest management objectives.

Finally, we wish to stress that the statute's purpose is not to turn DNR into a super-insurer of everyone who contracts with it. Rather, as *Green Bay Packaging* points out, the goal is to encourage employers to require that their contractors carry worker's compensation cov-

erage. *Id.* at 37, 240 N.W.2d at 429; *see also* Note, *Worker's Compensation—Liability of Principal Employer for Injuries to Employees of His Contractors or Subcontractors,* 1977 Wis. L. Rev. 185, 192–95. Giles testified that it is DNR policy to require their timber cutting contractors to carry coverage and that DNR normally "verifies" and "monitors" this. While Rand stated that he had coverage, this statement was never corroborated. More careful adherence to this policy will avoid liability determinations such as in this case.

We hold that Chapman has established as a matter of law that DNR is liable for his worker's compensation benefits under sec. 102.06, Stats., and affirm the circuit court.

*By the Court.*—Order affirmed.