Daniel P. LeClair, Michael J. LeClair, Dean Swaer, Judy Swaer, Todd Ruleau, and Louis J. Ruleau, Plaintiffs-Appellants,†

v.

Natural Resources Board, and Department of Natural Resources, Defendants-Respondents.

Court of Appeals

*No. 91–2316. Submitted on briefs January 8, 1992.—Decided March 19, 1992.*

(Also reported in 483 N.W.2d 278.)

†Petition to review denied.

For the plaintiffs-appellants the cause was submitted on the briefs of *Jon P. Axelrod, Stephen E. Bablitch*

and *William D. Mollway* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.,* of Madison.

For the defendants-respondents the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Philip Peterson,* assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. Daniel LeClair and five other Lake Michigan commercial fishers appeal from a summary judgment dismissing their action against the Wisconsin Department of Natural Resources and the Natural Resources Board. The issues are whether certain rules promulgated by the department: (1) operate to revoke appellants' fishing permits and thus require an adjudicatory hearing under sec. 227.51(3), Stats.; (2) are improperly directed at a closed class; (3) constitute an unconstitutional "taking" of their property; or (4) conflict with the Wisconsin safe place law. We resolve all issues in favor of the department and affirm the judgment.

The facts are not in dispute. Appellants are, and have been for many years, "trawlers" who make their living harvesting forage fish, such as alewives, chubs and smelt, in the waters of Lake Michigan and Green Bay. They tow large nets, called "trawls," through the waters to catch the fish, which are used principally for industrial purposes and in the manufacture of pet foods (although some smelt are gathered for human consumption).

Appellants hold annual forage fish "Harvest Quota Permits" issued by the department which expire on June 30 of each year. These appellants, in fact, hold all trawling permits issued for Lake Michigan. The permits are issued pursuant to Wis. Adm. Code ch. NR 25, and they authorize the holders to take specified amounts of each species of fish in specified waters. The actual fish quotas

are set forth in various administrative rules in ch. NR 25.

In March, 1991, the Natural Resources Board adopted rules repealing, recreating and amending several sections of ch. NR 25, including those setting the forage fish quotas. Among other things, the rules end commercial alewife fishing on the lake and restrict the amount of chubs and smelt which can be taken (and, with respect to smelt, they limit the fishing to nighttime hours). The board adopted a set of identical emergency rules which took effect immediately—on April 1, 1991—and remained in effect until August 29, 1991, when they were replaced by the permanent rules.

The rules were promulgated by the department in order to conserve the forage fish population in the lake, which department studies had shown to be in serious danger of depletion.[1] They were adopted after several

---

[1] A report accompanying the rule proposals placed before the board summarized the necessity for the rule changes:

> Special task forces of the Great Lakes Fishery Commission concluded that alewives need protection to recover from precariously low levels. Recent studies indicate commercial harvest and salmonid predation of alewives exceed safe levels. Alewife commercial harvest and salmon stocking must both be dramatically reduced to allow recovery of alewife stocks.
>
> These same task forces also feel strongly that the salmon sport fishery will not recover until alewife populations recover sufficiently to provide an adequate forage base. Disease epidemics brought on by diet-related stress will continue to devastate chinook salmon stocks and the sport fishery.
>
> Smelt are also an important forage for sport fish in Lake Michigan. Although studies of smelt population dynamics are not complete, preliminary observations suggest smelt stocks have also declined. Spring smelt spawning runs in Green Bay tributaries have not occurred at all in the last 5 years. Smelt harvest by sport dippers has shrunk to virtually nothing in the last few years.
>
> Staff feel that a better balance between forage fish stocks, commercial harvest and predation by sport fish must be achieved to

quasi-legislative hearings conducted under the rulemaking procedures prescribed in ch. 227, Stats., and appellants participated at every level. They provided written comments at the hearings and personally appeared before the Natural Resources Board.

Appellants operated under their existing permits—pursuant to the "new" quotas established by the emergency rules—from April 1 to June 30, 1991, when their permits were renewed, and continued to do so thereafter. Then, on August 30, the day before the permanent rules took effect, they sued for a declaratory judgment that the rules were invalid and sought a temporary restraining order prohibiting the department from enforcing them during the pendency of the action.

After a lengthy hearing, the trial court denied the motion for temporary relief on grounds that appellants had not established a reasonable likelihood of succeeding on the merits of their challenge. In order to expedite consideration of an appeal, both parties moved for summary judgment and the court granted the department's motion.

In reviewing summary judgments, we employ the same analysis as the trial court. *Spring Green Farms v. Kersten,* 136 Wis. 2d 304, 315-17, 401 N.W.2d 816, 820-21 (1987). Generally, summary judgment is appropriate where, as here, there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *In re Cherokee Park Plat,* 113 Wis. 2d 112, 115-16, 334 N.W.2d 580, 582-83 (Ct. App. 1983).

maintain a healthy and stable Lake Michigan fishery. The proposed rule will stop commercial harvest of alewives and limit commercial harvest of smelt to allow recovery of these stocks. Salmon stocking will also be reduced to allow better survival of both predator and prey fish stocks.

■ A judgment declaring an administrative rule invalid may be entered in three circumstances: (1) if the rule violates the constitution; (2) if it exceeds the statutory authority of the agency adopting it; or (3) if it was adopted without compliance with statutory rulemaking procedures. Sec. 227.40(4)(a), Stats.; *Liberty Homes, Inc. v. DILHR,* 136 Wis. 2d 368, 373, 401 N.W.2d 805, 807 (1987).

Appellants argue first that the department's rules are in conflict with state law because they "revoke, annul or withdraw [their fishing] rights without providing for the mechanism of a hearing." We consider this a claim that the rule exceeds the department's statutory authority.

The argument proceeds as follows: (1) forage fish trawling permits are "licenses"; (2) in Wisconsin, licenses cannot be revoked without an adjudicatory hearing; and (3) since there was no adjudicatory hearing before the rules were changed, the changes conflict with sec. 227.51(3), Stats., which provides:

> Except as otherwise specifically provided by law, no revocation, suspension, annulment or withdrawal of any license is lawful unless the agency gives notice by mail to the licensee of facts or conduct which warrant the intended action and the licensee is given an opportunity to show compliance with all lawful requirements for the retention of the license.

■ We reject the argument. Appellants' permits were not "revo[ked], suspend[ed], annul[ed] or withdrawn." The department simply promulgated new rules to pro-

tect the environment, as it has authority to do.[2] As a result of the changes, their permits—which, by their terms, allow appellants to fish commercially in Lake Michigan "in accordance with the provisions of Chapter NR 25"—became subject to, and were renewed with, the new fish harvest quotas. An adjudicatory hearing is not required in this situation, nor would one serve any purpose.

As we have noted, an adjudicatory hearing is designed to give the licensee "an opportunity to show compliance with all lawful requirements for the retention of the license." Section 227.51(3), Stats. There is no question in this case of appellants' compliance with the requirements for retention of their trawling permits, and their permits were in fact renewed (with the new quotas).

What appellants really argue here is that because the new rules impact negatively upon them, they are entitled to have an adjudicatory hearing rather than (or in addition to) the legislative-type hearings that are part of the rule-making process. We agree with the department, however, that if appellants' position were to prevail, any change in statutes or rules that might negatively affect a permit holder would constitute a "revocation" of the permit requiring an adjudicatory hearing, and that such a process would seriously hinder

---

[2]The department's rule-making authority is set forth in sec. 29.33(1), Stats.:

> The [DNR] may . . . designate the areas . . . under the jurisdiction of this state where commercial fishing operations shall be restricted. The [DNR] may establish harvest limits and allocate the harvest limits among commercial fishing licensees . . .. The limitations on licenses . . . shall be based on the available harvestable population of fish and in the wise use and conservation of the fish so as to prevent overexploitation.

the department in carrying out its regulatory responsibilities in this area.

Appellants have not established any right, statutory or otherwise, to an adjudicatory hearing as a condition to the department's exercise of its statutory authority to establish (and amend) the rules and regulations applicable to commercial fishing on Lake Michigan.

Appellants next argue that the rules are invalid because they are directed to a "closed class" in violation of sec. 227.01(13), Stats., the definitional section of ch. 227, which states that the term "rule" does not include "any action . . . which . . . [i]s an order directed to a specifically named person or to a group of specifically named persons that does not constitute a general class . . .."

The new rules promulgated by the DNR were not directed to a closed class. They apply to all commercial fishers who held forage fish trawling permits.[3] Although there are not many people who fit this category—indeed, as we noted earlier, these six appellants hold all permits issued by the department—the rule applies to them as members of a general class of commercial forage fishers. It is not directed to them individually or as a group.

Appellants next argue that the rule revision constitutes a "taking" of their property—the permits authorizing them to fish under the former quotas—within the meaning of the fourteenth amendment to the United States Constitution and art. I, sec. 13 of the Wisconsin

[3]Persons are eligible for forage fish trawling permits if they hold a valid commercial fishing license and reported a commercial harvest of forage fish by trawls between January 1, 1984, and December 31, 1985. Thus, the rules are directed to a "general" class, not to specifically named persons.

Constitution,[4] entitling them to hearings and other procedural due process requirements before the right may be taken away—and to compensation for the taking.[5] Again, we disagree.

We begin by noting the familiar rule that, like statutes enacted by the legislature, regulations adopted by administrative agencies "carry a heavy presumption of constitutionality and the challenger has the burden of proving unconstitutionality beyond a reasonable doubt." *Skow v. Goodrich,* 162 Wis. 2d 448, 450, 469 N.W.2d 888, 889 (Ct. App. 1991).

The due process clauses "impose[ ] constraints on governmental decisions that deprive individuals of . . . property interests . . .." *Patterson v. Bd. of Regents,* 114 Wis. 2d 495, 500, 339 N.W.2d 130, 132 (Ct. App. 1983). Thus, to succeed on this claim, appellants must establish that they had a property interest in their quota permits. *See Board of Regents v. Roth,* 408 U.S. 564, 571 (1972). And they can have a property interest in the permits only if they have "a legitimate claim of entitlement to [them]." *Roth,* 408 U.S. at 577. In this context, "entitlement" is something more "than an abstract need or

---

[4]"The property of no person shall be taken for public use without just compensation therefor." Art. I, sec. 13, Wis. Const. "[P]rivate property [shall not] be taken for public use, without just compensation." U.S. Const. Amdt. 5.

[5]As we have noted above, appellants were subject to the new fishing restrictions when the emergency rule became effective on April 1, 1991, and their permits expired and were renewed three months later on June 30. And, as indicated, they did not challenge the emergency rule, but brought this action several months later when the final rules came into effect.

desire"—or "a unilateral expectation"—that the permits would continue unaltered. *Id.*

We also note that "[p]roperty interests are not created by the Constitution." *Taplick v. City of Madison Personnel Board,* 97 Wis. 2d 162, 170, 293 N.W.2d 173, 177 (1980); *Roth,* 408 U.S. at 577. Rather, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577; *Taplick,* 97 Wis. 2d at 170, 293 N.W.2d at 177.

The benefit to which appellants claim entitlement is the right to be issued renewed forage fish trawling permits each year with the same quotas as their existing permits; and they maintain that if those quotas are changed, they are entitled to the same protections and remedies as persons suffering governmental taking of their real or personal property. But the applicable state law—the department's commercial fishing regulations[6]—plainly states that no one may fish for forage fish commercially without a permit, and that permit holders must hold a valid fishing license, which must be renewed every year. Wis. Adm. Code sec. NR 25.07(2)(c).[7] There is nothing in state statutes or rules granting any "entitlement" to forage fishing licenses, or to indefinite continuation of the fish quotas and time and area restrictions contained in existing permits. Nor do the terms of permits themselves—which, as we have

---

[6]Duly enacted administrative regulations, such as those found in ch. NR 25, have the force of law in Wisconsin.

[7]This provision has since been repealed to reflect the rule changes.

noted, allow commercial fishing only "in accordance with the provisions of Chapter NR 25"—suggest the existence of any such right or entitlement. We agree with the following analysis by Professor Andrea Peterson:

> [W]hen the government grants [an] economically valuable right [to an individual] against other private parties or the government, it often reserves the power to modify or eliminate those rights through a change in the law reflecting a change in public policy. When the government subsequently acts pursuant to that reserved power, no deprivation of property occurs, because the government does not thereby take away anything it had unconditionally given . . ..

A. Peterson, *The Takings Clause: In Search of Underlying Principles Part II—Takings as Intentional Deprivations of Property Without Moral Justification,* 78 CAL. L. REV. 55, 62–63 (1990).

Such a view is consistent with *Olson v. State Conservation Comm'n,* 235 Wis. 473, 484, 293 N.W. 262, 267 (1940), where the supreme court held that commercial fishers on Green Bay had no right to restrain the State Conservation Commission from enforcing commercial fishing regulations because the fishers' licenses "create[d] no vested or permanent rights." In a later case, *LeClair v. Swift,* 76 F. Supp. 729 (E.D. Wis. 1948), a commercial fisher sought to enjoin the Conservation Commission from "interfering" with his Lake Michigan fishing activities. The district court rejected the claim, and while the case is not binding precedent in Wisconsin courts, *Professional Office Bldgs. v. Royal Indem. Co.,* 145 Wis. 2d 573, 580–81, 427 N.W.2d 427, 429–30 (Ct. App. 1988), we agree with the court's analysis:

> Section 29.02, Wis. Stats., provides: "(1) The legal title to, and the custody and protection of, all

wild animals within this state is vested in the state for the purposes of regulating the enjoyment, use, disposition, and conservation thereof."[8] . . . Section 29.01(1), Wis. Stats., [the present sec. 29.01(14)] defines the term "wild animal" to mean any mammal, bird, fish, or other creature of a wild nature . . .;

. . ..

It should be kept in mind that commercial fisher[s] . . . do not have any absolute right to fish in waters under the control of the State of Wisconsin. Any property right in the fish in Wisconsin waters is in the State prior to the time they may be caught.

It is not only the right, but the duty, of the State to preserve for the benefit of the general public, the fish in its waters from destruction or undue reduction in numbers . . .. As trustee for the people, in the exercise of this right and duty, the State may conserve fish and wild life by regulating or prohibiting the taking of same . . .. It is well established . . . that by virtue of residual sovereignty, a State, as the representative of its people and for the common benefit of all of its citizens, may control the fish and game within its borders, and may regulate or prohibit such fishing . . ..

. . ..

Plaintiff is licensed as a commercial fisher[ ] by the State of Wisconsin. Without a State license he would not be permitted to engage in commercial fishing in . . . Lake Michigan . . .. Such licenses are not contracts and create no vested or permanent rights. In accepting such a license to operate as a commercial fisher[ ] plaintiff agreed to take fish in accordance with the pertinent State laws and regulations. *LeClair,* 76 F. Supp. at 732–33 [citations omitted].

Appellants argue, however, that *Olson* and *LeClair* are outdated, and that "[u]nder modern constitutional

---

[8]The statute reads the same today.

analysis" a commercial fisher's interest in his or her quota permit "constitutes a property interest meriting constitutional protection." In support of the argument, they refer us to *Bell v. Burson,* 402 U.S. 535 (1971). In that case, the plaintiff, an uninsured motorist, was involved in an auto accident, and his license was taken away under Georgia law until such time as he either posted cash or a bond in the amount of damages claimed by the other party or until his liability was determined in court. The Supreme Court, recognizing that the plaintiff's ability to drive a car was essential to the pursuit of his livelihood, ruled that his license could not be taken away "without that procedural due process required by the Fourteenth Amendment." *Id.,* 402 U.S. at 539.

The instant case, however, is not one in which an individual licensee or permittee has had his or her license revoked or suspended. Appellants retain their permits, albeit with added restrictions on the catch; and while they claim the restrictions will have a serious effect on their incomes, they have not been prohibited from forage fishing. Nor, as we have said earlier, have they been singled out; the challenged rules apply to all holders of forage fish permits. We note in this regard the Supreme Court's statement in *Bell,* to the effect that if the Georgia statute had "barred the issuance of licenses to all motorists who did not carry liability insurance or who did not post security" there would be no due process problem. *Id.*[9]

---

[9]The other case cited by appellants on this point, *Bundo v. City of Walled Lake,* 238 N.W.2d 154 (Mich. 1976), involved suspension of a resort's liquor license. Citing *Board of Regents v. Roth, supra,* and similar cases, the Michigan court ruled that because the resort owner could be said to have an interest in renewal of the license, he was entitled to "rudimentary due process" before it could be taken away. *Bundo,* 238 N.W.2d at 165.

Appellants also suggest that "modern Wisconsin case law" has repudiated the holdings in *Olson* and *LeClair*, and refer us, without discussion, to *Waste Management of Wisconsin v. DNR*, 128 Wis. 2d 59, 77, 381 N.W.2d 318, 326 (1986) (*WM I*), and *Waste Management of Wisconsin v. DNR*, 145 Wis. 2d 495, 498, 427 N.W.2d 404, 406 (Ct. App. 1988) (*WM II*).

*WM I* involved a permit issued by the department for operation of a landfill site. The permit was conditioned "upon compliance with the provisions of any plan approval and subsequent modifications thereof . . .." Because the operator's overall plan included construction specifications in addition to operational plans, and because the construction had been specifically approved by the department as required by statute, the court held that the license created a "legitimate claim of entitlement" to operate the site without being required to mod-

First, as we noted with respect to *Bell*, this case does not involve revocation or failure to renew the appellants' permits. Second, the *Bundo* court's conclusion flowed largely from the Michigan statute which provided a considerably less strict standard for renewal of licenses than for initial licensing. Indeed, the court characterized the statute as being "geared to permit renewal of licenses to take place as a matter of course." *Id.*, 238 N.W.2d at 161. Thus, said the court, the resort owner's reliance "upon a licensing practice which provided for renewal as a matter of course in most instances, has a property interest which would entitle him to due process protection." *Id.* at 161. The statutes giving the department wide regulatory authority over the natural resources, fish and game of Wisconsin, and the absence of anything in the permits themselves, or the laws and rules under which they are issued, to indicate that renewal was a mere formality and would be done simply as a "matter of course" each year with unchanged quotas or other restrictions, provide ample grounds for concluding that *Bundo* has little application to the issues before us.

ify its construction. *Id.,* 128 Wis. 2d at 77, 381 N.W.2d at 326. The court also held, however, that the license *did not* create any such claim of entitlement to operate the site free from any other restrictions or modifications. *WM I*'s holding is thus grounded on a specific "prior approval" statute, and because there is no similar statute in this case, we do not see *WM I* as requiring the result appellants seek. As for *WM II,* the page to which appellants have referred us simply cites *WM I* for the above proposition.

Finally, appellants point to a federal court of claims case, *Jackson v. United States,* 103 F. Supp. 1019 (Ct. Cl. 1952), as supporting their assertion that "[o]ther courts have specifically recognized that fishing rights constitute property meriting constitutional protection." In that case, however, the fishing permit was renewable as "a matter of right, unless misconduct should occur justifying refusal of renewal." *Id.* at 1020. In addition, the licensee could sell or devise the license, or let it pass to his or her estate upon death. The court held that, given those terms, the license carried property rights which were taken away when the government took over his fishing grounds for military purposes during World War II. Appellants' permits provide no such renewal rights and are not devisable.[10]

As indicated earlier, the new rules limit appellants' smelt fishing to nighttime hours in order to avoid incidental catches of alewives. Appellants argue that, due to the increased dangers involved in night fishing, this section of the rule conflicts with the Wisconsin safe place law, sec. 101.11, Stats., and thus violates sec. 227.10(2),

---

[10]A second court of claims case cited by appellants, *Todd v. United States,* 292 F.2d 841 (Ct. Cl. 1961), involved the permits issued under the same Maryland statute as those at issue in *Jackson.*

Stats., which states that "[n]o agency may promulgate a rule which conflicts with state law." We disagree.

Section 101.11, Stats., requires every employer to furnish employment "which shall be safe for the employes . . . and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employes . . .." The statute requires an employer to make the work place "as safe as the nature of the place will reasonably permit." *Dykstra v. Arthur G. McKee & Co.*, 92 Wis. 2d 17, 26, 284 N.W.2d 692, 697 (Ct. App. 1979).

Appellants supported their argument in the trial court with the affidavit of a commercial fishing captain who outlined what he believed to be the dangers of night trawling. He stated: "It is irresponsible of me to take my crew and vessel and place us in a continual position of danger."

Other than quoting from the affidavit, appellants do not further describe the nature of the "conflict," and we see none. The department's actions do not violate sec. 101.11, Stats., because it is not the "employer" of any of the appellants' officers or crews. Nor do the department's rules require appellants or anyone else to trawl at night, any more than they require trawling in stormy or foggy weather when being on the water might be more dangerous than at other times. Finally, the department points out that the captain's affidavit is based on his assumption that "all such (nighttime) trawling must be done in a narrow area on Green Bay" in the same location as the Green Bay shipping channel, which is a "very congested area," whereas the actual smelt trawling area encompasses more than 157 square miles and is as much as eleven miles wide. Appellants have not persuaded us

that the rule is nullified by the safe place law.[11]

 *By the Court.*—Judgment affirmed.

---

[11]LeClair submitted a letter January 31, 1992, to this court making additional arguments based on two documents recently issued by the DNR. Since the briefing schedule for this case had already been completed, we do not consider them. *See* sec. 809.83(2), Stats.