(Trial Court #90 CV 3184) Major BURRUS, Plaintiff-Respondent,

v.

Patricia GOODRICH, Stephen Bablitch, Russell Leik, Gary R. McCaughtry, and Mike Traut, Defendants-Appellants.

(Trial Court #90 CV 3185) STATE EX REL. John M. JOHNSTON, Plaintiff-Respondent,

v.

Michael TRAUT and Russell Leik, Defendants-Appellants.

(Trial Court #89 CV 3961) Alan W. RIVEST, Plaintiff-Respondent,

v.

Patricia GOODRICH and State of Wisconsin, Defendants-Appellants.

(Trial Court #89 CV 430) Pauline SMART, Carol Alexander, Rhonda Ambuehl, Robert L. Beavers, Lawrencia Bembenek, Kathleen Braun, Grover L. Crain, Albert M. Garcia, Richard L. Grennier, Woodrow Guiden, Johnnie B. Herron, Garry Horneck, George H. Johnson, Mark C. Ketterhagen, Lowell Stan Latender, Mark J. Leroux, Frank MacDougall,

Jody Mayo, Barbara Miller, Claude D. Miller, Robert J. Morgan, Dale A. Pautz, Harlan Richards,† Francisco J. Ruiz, Bob Scarrah, Harvey J. Schultz, Allerd J. Sharlow, Sr., Danny Shears, Bonnie Smith, Al Spanle, Richard Steele, Thomas R. Tucker, Richard L. Wagner, Johnny Wooten, Alan W. Rivest, Plaintiffs-Respondents,

v.

Patricia GOODRICH, Stephen Bablitch, Defendants-Appellants.

Court of Appeals

*No. 94–1329. Oral argument March 30, 1995.—Decided May 11, 1995.*

(Also reported in 535 N.W.2d 85.)

†Petition to review denied.

For the defendants-appellants the cause was orally argued by *Peter C. Anderson* and submitted on

the briefs of *James E. Doyle*, attorney general, and *Peter C. Anderson*, assistant attorney general.

For the represented plaintiffs-respondents the cause was orally argued by and submitted on the brief of *Jeff Scott Olson* of Madison.

Before Eich, C.J., Sundby and Vergeront, JJ.

EICH, C.J. The plaintiffs in this action, all inmates serving life sentences in the Wisconsin state prison system, sought a declaratory judgment voiding various rules adopted by the Wisconsin Department of Corrections governing inmate security classifications within the system. They claimed that the rules violated the *ex post facto* clauses of the state and federal constitutions.

The trial court concluded that the rules, which establish minimum periods of time that life-term inmates are required to serve in maximum-security institutions, had the effect of retroactively placing conditions on the inmates' sentences that were "more onerous" than those prescribed by rules in effect at the time they committed the offenses for which they were imprisoned. Thus, the court determined that the rules were invalid *ex post facto* laws. The defendants, officials of the Department of Corrections, appeal from the judgment declaring the rules to be null and void.

The issue—the constitutionality of the rules—is one of law, which we review independently, owing no deference to the trial court's conclusions. *State ex rel. Jones v. Gerhardstein*, 141 Wis. 2d 710, 733, 416 N.W.2d 883, 892 (1987). We conclude that no *ex post facto* violation exists and we therefore reverse the judgment.

660

The facts are not in dispute. The Department of Corrections adopted rules relating to the security classification of prison inmates, effective September 1, 1989. Under the rules, inmates serving life sentences, who are essentially those convicted of first-degree murder, are assigned to one of four "categories," based on the nature of the offenses for which they were convicted, their criminal histories and the structure of their sentences. WIS. ADM. CODE § DOC 302.145(2). Minimum periods of maximum-security incarceration are established for each category. WIS. ADM. CODE § 302.145(3)(b).[1] In each instance, the department's

---

[1] Because of the manner in which the categories are established in the rules, they are most easily described by taking them somewhat out of order. A "category I lifer" is an inmate who either committed a "particularly vicious murder" or other felony "involving torture, sexual abuse, body dismemberment, mutilation or sacrificial rituals, or multiple murders," or one whose prior criminal record includes one or more felony or misdemeanor convictions or, within ten years before commission of the current offense, one or more juvenile delinquency adjudications "for behaviors which reflect an intent to inflict great bodily harm . . . on the victim." Under the rules, category I lifers must serve, generally, a minimum of fifteen years in a maximum-security institution.

A category III lifer is an inmate who does not meet the category I criteria and whose offense was committed spontaneously on someone with whom he or she had a relationship. A category III lifer is one who has had no prior felony convictions and no prior juvenile delinquency adjudications within the ten years preceding his or her felony conviction, and fewer than five prior misdemeanor convictions and juvenile delinquency adjudications within the ten years preceding his or her current misdemeanor conviction and no previous prison incarcerations. Category III lifers must serve a minimum of six years in a maximum-security institution.

"classification chief" has discretion to place an inmate in a medium-security institution at an earlier date. Other facts will be referred to below. *Id.*

In Wisconsin, administrative rules enacted pursuant to an agency's statutory powers have the force and effect of law. *Kranzush v. Badger State Mut. Casualty Co.*, 103 Wis. 2d 56, 77-78, 307 N.W.2d 256, 267-68 (1981). As such, they are entitled to the same presumption of constitutionality as are laws enacted by the legislature. *LeClair v. Natural Resources Bd.*, 168 Wis. 2d 227, 236, 483 N.W.2d 278, 282 (Ct. App. 1992). It is a strong presumption, and one challenging the constitutionality of such rules has a "heavy burden of persuasion." *Chappy v. LIRC*, 136 Wis. 2d 172, 184, 401 N.W.2d 568, 573 (1987).

> It is not sufficient that the challenger show that there is doubt as to the [rule]'s constitutionality. The challenger . . . must prove beyond a reasonable doubt that the [rule] is unconstitutional.
>
> In analyzing a [rule]'s constitutionality, "[e]very presumption must be indulged to sustain the [rule] if at all possible and, wherever doubt exists as to a [rule]'s constitutionality, it must be resolved in favor of constitutionality." Thus "[i]f there is any reasonable basis upon which the [rule]

---

A category IV lifer is an inmate whose parole eligibility was set by the court at a date later than provided in § 304.06(1), STATS. Category IV lifers must serve in a maximum-security institution "at least up to the date 3 years prior to his or her parole eligibility date," or for a minimum of fifteen years, reduced by a sentence credit, whichever is longer.

Finally, a category II lifer is an inmate who does not meet the criteria of any of the other categories. He or she must serve a minimum of eight years in a maximum-security institution.

may constitutionally rest, the court must assume that the [administrative agency] had such fact in mind and [adopted the rule] pursuant thereto. The court cannot try the [agency] and reverse its decision as to the facts. All facts necessary to sustain the [rule] must be taken as conclusively found by the [agency], if any such facts may be reasonably conceived in the mind of the court."

*Id.* at 184-85, 401 N.W.2d at 573-74 (citation and quoted sources omitted). We are not concerned with the merits of the rules or with the wisdom underlying the agency's decision in adopting them. Our only concern is whether there is any reasonable basis for exercise of the rulemaking power; if there is, we are obliged to uphold the agency's action. *Quinn v. Town of Dodgeville*, 122 Wis. 2d 570, 577, 364 N.W.2d 149, 154 (1985).

Article I, section 10, of the United States Constitution and article I, section 12, of the Wisconsin Constitution prohibit the enactment of *ex post facto* laws. Historically defined, such laws "creat[e] . . . crimes after the commission of the fact, or, in other words, [which] subject[] . . . men to punishment for things which, when they were done, were breaches of no law . . . ." THE FEDERALIST NO. 84, at 533 (Alexander Hamilton) (Benjamin F. Wright ed., 1961).

More modern restatements of the principle consider it as barring any law

which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available accord-

ing to law at the time when the act was committed
. . . .

*Beazell v. Ohio*, 269 U.S. 167, 169 (1925).[2]

The challenge in this case is based on the second element: the inmates contend that the rules make the punishment for their offenses "more burdensome" after-the-fact.

The Wisconsin Supreme Court considered a similar challenge in *State v. Thiel*, 188 Wis. 2d 695, 524 N.W.2d 641 (1994). Thiel, who had been convicted of a felony in 1970, challenged a law passed eleven years later that prohibits convicted felons from possessing firearms. He claimed that the statute's application to him retroactively punished him for a crime committed prior to its adoption, in violation of the *ex post facto* clause. The court rejected Thiel's argument, concluding that because the firearms-possession statute "was not enacted with the intent to punish convicted felons" but rather was enacted "out of concerns of public safety," there was no constitutional violation. *Id.* at 697, 524 N.W.2d at 641.

The *Thiel* court considered what constitutes "punishment" within the meaning of the *Beazell/Collins* rule. The court began by recognizing the proposition that, as opposed to statutes enacted with punitive intent, " '[w]here the disability is imposed to accomplish some other legitimate governmental purpose,' " *ex post facto* doctrines "do not apply." *Thiel*, 188 Wis. 2d at 703, 524 N.W.2d at 643-44 (quoting *Wisconsin Bingo*

---

[2] The *Beazell* definition was confirmed by the Supreme Court in *Collins v. Youngblood*, 497 U.S. 37, 42-43 (1990), and, as we discuss below, was adopted verbatim by the Wisconsin Supreme Court in *State v. Thiel*, 188 Wis. 2d 695, 703, 524 N.W.2d 641, 644 (1994), as the appropriate test under the *ex post facto* clause of the Wisconsin Constitution.

*Supply & Equip. Co. v. Wisconsin Bingo Control Bd.*, 88 Wis. 2d 293, 305, 276 N.W.2d 716, 721 (1979)). The court went on to state:

> "The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation. . . ."

*Id.* at 704, 524 N.W.2d at 644 (quoting *Wisconsin Bingo*, 88 Wis. 2d at 305, 276 N.W.2d at 721).[3]

Then, looking to "the facts of th[e] case and the legislative aim of the statute to determine whether it was enacted with punitive intent," the *Thiel* court found "no evidence that the principal purpose of [the statute] is punishment, deterrence or retribution." *Thiel*, 188 Wis. 2d at 705-06, 524 N.W.2d at 645. "Rather," said the court, "our examination of [the statute], in its entirety, leads us to conclude that [it] was aimed not at punishment but at protecting public safety through firearm regulation." *Id.* at 706-07, 524 N.W.2d at 645. The court reached that conclusion by noting that, like felons, persons found not guilty of crime by reason of mental disease or defect—the other group prohibited from possessing firearms under the statute—are persons "who are likely to misuse firearms." *Id.* at 707, 524 N.W.2d at 646. As a result, the court felt the conclusion was inescapable "that the statute is aimed at protecting the public, not at punishing

---

[3] The quoted statement was taken from the United States Supreme Court's decision in *De Veau v. Braisted*, 363 U.S. 144, 160 (1960).

the individual," and thus was not an *ex post facto* law. *Id.* at 707-08, 524 N.W.2d at 646.

*Thiel* was decided after the trial court issued its decision in this case—a decision that, like the inmates' arguments on this appeal, places great reliance on language in *Weaver v. Graham*, 450 U.S. 24 (1981). In *Weaver*, the Court applied a two-part test to determine whether a statute reducing the amount of "good time" earned by prison inmates was unconstitutional under the *ex post facto* clause, when applied to inmates whose crimes were committed prior to the statute's enactment: "[O]ur decisions prescribe that two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must *disadvantage the offender* affected by it." *Id.* at 29 (emphasis added) (footnotes omitted). Restating the point a few paragraphs later, the court remarked: "Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and *more onerous* than the law in effect on the date of the offense." *Id.* at 30-31 (emphasis added).

Emphasizing the italicized language, the inmates assert that time spent in a maximum-security institution is "more onerous" and more disadvantageous than time in a medium- or minimum-security institution, and they argue that, as a result, any rule that extends their maximum-security time is *per se* punitive and thus violative of *ex post facto* prohibitions.

We think *Weaver* is inapposite. First, the principal source of the "disadvantage"/"more onerous" language is a much older case, *Kring v. Missouri*, 107 U.S. 221, 228-29 (1883), where the Court defined an *ex post facto* law as, among other things, one that, "in relation to the

offen[s]e or its consequences, alters the situation of a party to his disadvantage." That definition was expressly overruled in *Collins v. Youngblood*, 497 U.S. 37, 50 (1990), as "depart[ing] from the meaning of the Clause as it was understood at the time of the adoption of the Constitution, and . . . [un]supported by later cases." As we have mentioned above, the United States Supreme Court, in *Collins*, adopted the "*Beazell* formulation" as the definition most "faithful to our best knowledge of the original understanding of the Ex Post Facto Clause." *Id.* at 43. That is, of course, the same definition our own supreme court adopted in *Thiel* as the appropriate test under the Wisconsin Constitution.

Second, the inmate in *Weaver* suffered a loss of accumulated good time when the new law was passed and, as a result, was required to serve an additional two years in prison. *Weaver*, 450 U.S. at 27. There is little question that extending an inmate's sentence is punitive. None of the life-term inmates in this case will spend any additional time in prison as a result of the challenged rules.

We also disagree with the inmates' argument that the rules must be considered punitive under the *Beazell/Collins/Thiel* test, that is, that they make more burdensome the punishment for a crime after its commission.

The analysis developed by the *Thiel* court for determining "punishment" under the *Beazell/Collins* test looks to " 'the objects on which the enactment . . . was focused' " and considers whether the " 'legislative aim was to punish . . . for past activity,' " or whether, on the other hand, the restrictions were " 'imposed to accomplish some other legitimate governmental purpose,' " or " 'come[ ] about as a relevant incident to . . . regulation of a present situation.' " *Thiel*, 188 Wis. 2d

667

at 703-04, 524 N.W.2d at 644-45 (quoted sources omitted).

Just as the *Thiel* court looked to companion statutes to assist in its analysis, we look first to other provisions in WIS. ADM. CODE, ch. DOC 302, which bear on the rules in question. WISCONSIN ADM. CODE § DOC 302.11 states that the purposes of prison security classifications are:

> (1) The treatment of the resident in accordance with individual needs, and the resources of the department of corrections;
> (2) The placement of the resident in a secure setting that provides supervision in accordance with the resident's needs; and
> (3) The social reintegration of the resident and the protection of the public through appropriate treatment and supervision.

No punitive purpose is suggested by these general rules. To the contrary, they emphasize the legitimate governmental and correctional aims of security-classification rules and procedures in general.

The record of the proceedings leading up to the adoption of the rules is to the same effect.[4] The rules were the product of the department's attempt to identify factors actually affecting risks posed by inmates

---

[4] While "[j]udicial inquiries into [legislative] motives are at best a hazardous matter," courts will look to "objective manifestations" in a statute's legislative history to determine whether it may be considered "punishment" in an *ex post facto* analysis. *Flemming v. Nestor*, 363 U.S. 603, 617 (1960); *see also Thiel*, 188 Wis. 2d at 705, 524 N.W.2d at 645. We see no reason that the same considerations should not apply to the construction and interpretation of rules adopted by an administrative agency in the exercise of its quasi-legislative powers.

and were intended to provide a means for obtaining consistent and objective review of risk factors in the assignment of inmate security classifications. There is no question that that is a valid and legitimate correctional function.

The inmates argue, however, that because the "categories" that determine the length of maximum-security time are related to the nature of the offenses they committed, and because maximum-security time imposes greater limitations on their "freedom"—a restriction they claim is "ordinarily associated with punishment"—the rules must be considered punitive. Again, we disagree.

Plainly, there is a legitimate governmental and correctional interest in ensuring that perpetrators of premeditated violent or heinous crimes have minimal opportunities to escape from an institution[5] or to commit similar crimes while in prison. Serving a minimum number of years in a maximum-security institution rationally advances that interest. Nor do we see anything irrational or necessarily punitive in keeping those posing greater risks to the institution, other inmates and the public, in maximum-security incarceration for longer periods of time than those posing lesser risks—especially where, as we discuss in more detail below, the department's classification chief has discretion to grant early transfer.

---

[5] The inmates point out that, of the 149 escapees from minimum-security institutions in 1989-90, none were life-term inmates. Even if such assertions could be considered relevant to our inquiry, we have not been informed how many, if any, lifers were actually housed in minimum-security institutions throughout that time.

The department concedes, as do we, that for most inmates, maximum-security time is "harder time" than medium- or minimum-security time. The reason is obvious and is well explained by the department:

> [W]hat an inmate security classification represents is the level of institutional restrictions on an inmate's freedom of movement, rights of association and ability to possess property, coupled with a particular institution's level of security staffing and physical security measures deemed necessary to maintain the secure movement and housing of persons serving lawful sentences of incarceration . . . . The reason for assigning security classifications is to ensure that an inmate is housed in an institution whose security level is no less than the inmate's security risks . . . .

We agree with the department that some of the most important facts that can be known about an inmate relating to the risks he or she might pose to the security of the institution, other inmates and the public are the crimes committed, the length of the sentence being served and the amount of time remaining before parole eligibility or release. And in one form or another, these factors constitute the majority of the criteria for assigning security classifications to inmates under the rules.[6]

---

[6] It may be, as the parties' briefs in this case illustrate, that "punishment" is in the eye of the beholder. One person might consider added maximum-security time under the rules as violative of the *ex post facto* clauses because, despite its relationship to legitimate correctional interests, it is basically penal in nature. Another person could reach the opposite conclusion on the basis of the rules' relationship to legitimate correctional interests, despite their concededly "harsher" effects. And even though decisions such as *Thiel* and *De Veau*

As the department also points out, "At bottom, the unavoidable situation justifying these rules is that there are people who have committed very terrible crimes who must be housed securely while they serve their lawful sentences." The security classification rules relate to the inmates' crimes and sentences only in the sense of being a necessary incident of prison administration and security and not an aspect of increased punishment.[7]

---

speak in terms of a seemingly strict "legislative aim or objective" test to determine whether a law or regulation is considered "punishment" in *ex post facto* terms, the inquiry must inevitably involve striking a balance—determining either expressly or implicitly that the legitimate corrections-related aspects of a rule or program change either do or do not outweigh the onus of its new or added restrictions. While not an express part of the *Beazell/Collins/Thiel* test, such a balancing seems to us to be implicit in the analysis. We have concluded in this case, of course, that the legitimate governmental and correctional interests these rules are designed to further are paramount.

[7] As such, they are similar to other aspects of incarceration that do not extend actual time served and may be changed or altered without implicating *ex post facto* considerations. *See, e.g., Francis v. Fox,* 838 F.2d 1147, 1150 (11th Cir. 1988) (more restrictive work-release regulations); *Glynn v. Auger,* 678 F.2d 760, 761 (8th Cir. 1982) (double-celling of inmates); and *Di Stefano v. Watson,* 566 A.2d 1, 6 (Del. 1989) (restrictive change in statutes allowing inmate participation in "outside" programs and visitation).

In *Dyke v. Meachum,* 785 F.2d 267, 268 (10th Cir. 1986), the court held that a change in security classification rules that resulted in an inmate having to serve twenty percent of his sentence before reclassification to minimum-security status, rather than ten percent of the sentence as before, "relate[d] to the internal administration of [the] prison" and did not violate the *ex post facto* clause "in the absence of any showing of a punitive intent" underlying the change. In so ruling, the court

Finally, to address the inmates' complaint that the rules are not sufficiently "individualized" to pass constitutional muster under the *ex post facto* clauses—another factor emphasized by the trial court in striking them down—we note that the rules not only differentiate among life-term inmates according to their demonstrated capacity to commit the most serious and violent crimes[8] but in all categories give the classification chief discretionary authority to make earlier transfers to a medium-security institution. As the department suggests, it is entirely possible that a life-term inmate might show a high degree of exemplary institutional adjustment or that other considerations would exist to justify early medium-security placement.

Considered as a whole, the rules establish presumptive security classifications for life-term inmates according to risks presented in four separate categories, and they permit recognition of individual or exceptional cases through a discretionary early-reassignment process. They were drafted to achieve

relied on *De Veau* (which, as we have noted above, the Wisconsin Supreme Court also relied on in *Thiel*) and on *Malloy v. South Carolina*, 237 U.S. 180, 183 (1915), where the Supreme Court stated that the clause was designed "to secure substantial personal rights against arbitrary and oppressive legislative action, and not to obstruct mere alteration in conditions deemed necessary for the orderly infliction of humane punishment."

[8] We note in this regard that the rules were designed to reflect actual classification practice. The fifteen-, eight- and six-year maximum-security time periods set for life-term inmates were based on a case-by-case analysis of the time actually served in maximum-security incarceration by inmates meeting the criteria established for each "category."

legitimate governmental and correctional ends, and nothing in the record suggests an aim to punish for past activity or to accomplish a more burdensome punishment. *See Thiel*, 188 Wis. 2d at 703-04, 524 N.W.2d at 644. The department's concern was not the imposition of additional penal sanctions on life-term inmates but was directed toward assessment and amelioration of the risks presented by inmates in all categories in a prison setting. Under such circumstances, the rules are "not punishment even though [they] may bear harshly upon [the ones] affected." *Id.* at 705, 524 N.W.2d at 645 (quoting *Flemming v. Nestor,* 363 U.S. 603, 614 (1960)).

*By the Court.*—Judgment reversed.